647 So.2d 1170 (1994)
Percy CORNISH and Shirley Mays Cornish
v.
STATE, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, et al.
No. 93 CA 0194.
Court of Appeal of Louisiana, First Circuit.
December 1, 1994.
Rehearing Denied February 2, 1995.
*1175 W. Hugh Sibley, Richard D. McShan, Sibley & McShan, Greensburg, for plaintiffs-appellees/appellants Percy Cornish & Shirley Mays Cornish.
Stacey Moak, Cicero & Moak, Baton Rouge, for defendant-appellant State, Through the Dept. of Transp. and Development.
Arthur R. Cooper, Bell, Cooper & Hyman, Baton Rouge, for defendant-appellant Ponchatoula Homestead & Sav. Ass'n.
Before FOIL, PITCHER and PARRO, JJ.
PARRO, Judge.
This personal injury action by Percy Cornish and Shirley Mays Cornish ("the Cornishs") against the State of Louisiana, through the Department of Transportation and Development ("DOTD") and Ponchatoula Homestead & Savings Association ("Ponchatoula") arises from a single car accident that occurred when the vehicle that Percy Cornish was driving ran off of the highway and into a cattle guard located on the state right-of-way. In a bifurcated trial, the trial judge decided the case as to DOTD, and the jury decided the case as to Ponchatoula. The factfinders' findings as to apportionment of fault and damages differed. Judgment was rendered according to the jury's verdict and the trial judge's decision. From this judgment, all parties appeal. For the following reasons, this court affirms in part, reverses in part, and vacates in part.

Facts and Procedural History
Percy Cornish ("Cornish") owned an eighteen wheeled truck ("work truck") and was self-employed as a trucker. When Cornish was not using his work truck, he was allowed *1176 to park it at a friend's (Ira Lee Johnson) house on Louisiana Highway 37 ("Hwy. 37") in Baywood, Louisiana.
On Friday, December 9, 1988, after spending the entire morning at home, Cornish departed in his 1979 GMC Larado pick-up truck between 1:00 p.m. and 2:00 p.m., ran a few errands, and drove to Johnson's house to perform repairs to his work truck.[1] Cornish admits that he might have consumed a beer prior to his afternoon departure from his home.
While Cornish was working on his work truck at the Hwy. 37 location, his brother, David Cornish, stopped by for a brief visit (five to ten minutes) between 5:30 p.m. and 6:00 p.m. David filled Cornish's eight to ten ounce glass with homemade cherry-bounce wine during his visit. Cornish began to consume this drink prior to David's departure. He consumed the rest of the drink immediately after David left. Thereafter, Johnson, who had been aware of Cornish's presence but had only observed his actions from afar, invited Cornish in for dinner between 6:30 p.m. and 7:00 p.m. After eating black-eyed peas, cornbread, and collard greens at Johnson's home, Cornish went outside to pick up the items that had been used to repair his work truck. Immediately thereafter, he left for his brother's house in Greensburg, Louisiana to ask for his help in repairing the work truck on the next day.
While Cornish was traveling north on Hwy. 37 toward Greensburg at approximately 8:30 p.m., he crossed a bridge approximately 5 miles before Greensburg. At some point after crossing this bridge, Cornish steered his vehicle to the right causing him to get onto the shoulder, where he traveled for at least 200 feet. The surface of the roadway within 200 feet of the Hwy. 37 bridge was in good condition, i.e., no depressions or pot holes and there were no sudden drop-offs from the lane of travel to the shoulder. It was a clear night. The weather was not a factor. As Cornish attempted to reenter the road, he went into a ditch and crashed into a cattle guard approximately 11½ feet from the traveled portion of roadway thereby injuring his hips, legs, knees, areas of the face, and lip.[2]
Ronald Pierce, the investigating state trooper, went to the hospital after investigating the scene and requested that blood be drawn to determine Cornish's blood alcohol level. Cornish's blood sample revealed that Cornish's blood alcohol content was .07 percent approximately two to two-and-one-half hours after the accident.
The Cornishs filed suit against DOTD alleging that the highway was defective due to DOTD's failure to place warning signs and that DOTD was negligent in placing a posted speed limit which was excessive for the roadway conditions, and in allowing a defective and dangerous condition to exist on the right-of-way. DOTD thereafter filed a third party demand against Ponchatoula as owners of the cattle guard. The Cornishs filed a supplemental and amending petition to add Ponchatoula as a party defendant in the main demand alleging that it created a hazardous obstacle in the highway right-of-way and failed to warn of the hazardous condition.
A bifurcated trial produced the following findings as to fault:

 Judge Jury
DOTD 50% 50%
Ponchatoula 35% 25%
Cornish 15% 25%

and the triers of fact awarded damages to the Cornishs as follows:

 Judge Jury
past medicals $ 54,101.38 $ 54,101.38
future medicals 30,000.00 40,000.00
past lost wages 103,000.00 65,000.00
future lost wages 500,000.00 400,000.00
past pain and suffering 200,000.00 100,000.00
future pain and suffering 50,000.00 100,000.00
permanent disability 250,000.00 175,000.00
loss of enjoyment of life 250,000.00 50,000.00
loss of consortium 50,000.00 50,000.00
 ------------- -------------
 total $1,487,101.38 $1,034,101.38.

*1177 The trial judge signed a judgment which incorporated all of these findings.
Ponchatoula appeals, contending that both the trial judge's findings and the jury's verdict are clearly wrong; therefore, it urges this court to conduct a de novo review of the record to determine if the cattle guard presented an unreasonable risk of harm, if Ponchatoula had custody of the cattle guard, and if Ponchatoula was negligent. It also questions the manner in which fault was apportioned by both triers of fact. Ponchatoula also requests that this court review the awards for future medical expenses, past lost wages, future lost wages and general damages by both triers of fact to determine if they are excessive.
DOTD appeals, urging this court to conduct an independent review of the record, as argued by Ponchatoula, to determine if DOTD's negligence caused the accident, if Cornish's fault was the sole cause of the accident, and the amount of damages, if any are owed by DOTD. In the event that this court finds that DOTD's negligence was a cause of the accident, DOTD urges that it was less than 50% at fault in causing Cornish's injuries.
The Cornishs appeal, requesting this court to reconcile the discrepancies between the trial judge's findings and the jury's verdict and to modify the judgment accordingly.

Standards of Review
The general rule is that a court of appeal may not overturn a judgment of a trial court absent an error of law or a factual finding which is manifestly erroneous or clearly wrong. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 882, n. 2 (La.1993). Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id. at 883. In other words, when findings are based on a credibility determination, a trial court's decision to credit the testimony of one of two or more witnesses can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 845 (La.1989). Before an appellate court may reverse a factfinder's determinations, it must find from the record that a reasonable factual basis does not exist for the findings and that the record establishes that the findings are clearly wrong (manifestly erroneous). Stobart v. State, Through Department of Transportation and Development, 617 So.2d at 882; see Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
Jurisprudence establishes that the manifest errorclearly wrong standard is inapplicable to cases involving bifurcated trials which resulted in inconsistent reasonable findings of fact by the trial judge and the jury. Richard v. Teague, 92-17 (La.App. 3rd Cir. 5/4/94), 636 So.2d 1160, 1168; Carr v. City of New Orleans, 626 So.2d 374, 376 (La.App. 4th Cir.1993), writ denied, 634 So.2d 398 (La.1994); Haydel v. Commercial Union Insurance Company, 617 So.2d 137, 139 (La.App. 5th Cir.), writ denied, 619 So.2d 551 (La.1993); McCullough v. Regional Transit Authority, 593 So.2d 731, 734 (La. App. 4th Cir.), writ denied, 595 So.2d 655 (La.1992); Felice v. Valleylab, Inc., 520 So.2d 920, 924 (La.App. 3rd Cir.1987), writs denied, 522 So.2d 562, 563 (La.1988); Thornton v. Moran, 348 So.2d 79, 81-82 (La.App. 1st Cir.), writs denied, 350 So.2d 897, 898, 900 (La.1977). This line of jurisprudence originated with the first circuit case of Thornton v. Moran, 348 So.2d 79 (hereinafter referred to as "Thornton II").
Regarding the development of this jurisprudential rule, in Thornton v. Moran, 341 So.2d 1136 (La.App. 1st Cir.1976), reversed, 343 So.2d 1065 (La.1977), a case involving two consolidated suits which were bifurcated for purposes of trial, this court discussed the issue of the standard of review to be applied to bifurcated trials resulting in conflicting findings of fact. This court concluded that it would apply the manifest error clearly wrong standard to the findings of the jury and the trial judge independently to determine if either was manifestly wrong rather than reconciling the two determinations to produce a single judgment. Thornton v. Moran, 341 So.2d at 1142 (hereinafter referred to as "Thornton I"). After reviewing the findings of each, this court concluded that neither the jury's verdict nor the trial judge's findings were clearly wrong. Id. at *1178 1142-1146. Therefore, conflicting findings by the triers of fact as to fault and damages were affirmed. The supreme court, on writs of certiorari, reversed and remanded the case with an order that the discrepancies in the reasonable factual findings be resolved and that a "single opinion" be rendered based on the record. Thornton v. Moran, 343 So.2d at 1065-1066.
On remand, this court in Thornton II, 348 So.2d 79, recognized its previous determination that the findings of both the trial judge and the jury were reasonably supported by the record. Id. at 81. Being mindful of the supreme court's decision that the application of the manifest errorclearly wrong standard to determine if both findings are reasonable was inadequate where inconsistent findings remain, this court proceeded to establish a standard of review to be applied by appellate courts in harmonizing the inconsistent factual findings, thus enabling it to render a single opinion based on the record as mandated by the supreme court.[3]Id. at 81.
In discussing the applicability of the manifest errorclearly wrong standard of review in Thornton II, this court held that the general standard of review is inapplicable "where opposite results are reached in bifurcated trials, and the intermediate appellate courts are mandated to resolve the differences regardless of the reasonableness of the conclusions of fact." Id. at 82. That is not to say that the manifest errorclearly wrong standard shall be disregarded totally in cases involving bifurcated trials.[4] We must be mindful that this court in Thornton I determined that the findings of both factfinders were reasonable and not clearly wrong. Having previously made this determination, this court formulated an additional standard of appellate review to be applied in bifurcated trials that resulted in inconsistent reasonable findings. This new standard requires that, after a careful review of the entire record, an appellate court examine each inconsistent reasonable finding to determine which factfinder's finding is more reasonable. Id. at 82.
With the above discussion in mind, we must proceed to determine whether the findings of fault and apportionment of fault by the trial judge and the jury are reasonable and not manifestly erroneous. See Thornton I, 341 So.2d at 1142-1143. In the event that this court finds that the findings of both as to any particular determination are manifestly erroneous, this court is free to evaluate the facts de novo, and after a review of the complete record, make our own findings as to that particular determination. See Rosell v. ESCO, 549 So.2d at 844, n. 2. If in initially applying the manifest error test to the findings of the factfinders, this court concludes that a finding by one of the factfinders was manifestly erroneous, but the finding of the other is not, then we are free to disregard the finding of the factfinder that was manifestly erroneous. In other words, we would eliminate the clearly wrong finding and be left with only one reasonable finding. In the two previously mentioned scenarios, there would be no need for this court to apply the additional standard of review established in Thornton II because we would not have reasonable findings that are inconsistent.
The Thornton II standard should be applied only after an appellate court is satisfied that the record contains sufficient evidence to furnish a reasonable factual basis to support the conclusions reached by each trier of fact and that these conclusions are inconsistent, *1179 thus requiring harmonization to arrive at a single decision. See Thornton I, 341 So.2d at 1142-1143.

Findings of Fault
The jury and the trial judge both found that DOTD, Ponchatoula and Cornish were at fault in causing Cornish's injuries. At the time of trial, LSA-R.S. 13:5105 prohibited a jury trial of a suit against the state, a state agency or political subdivision. Therefore, the jury's verdict had no weight on the issue of fault of DOTD. Since the jury was without power to adjudicate this issue, there is, in effect, no true conflict between this finding of fault by the jury and judge. See Bishop v. Shelter Insurance Company, 461 So.2d 1170, 1174 (La.App. 3rd Cir.1984), writ denied, 465 So.2d 737 (La. 1985). With respect to the fault findings as to Ponchatoula, there is also no conflict. Where there is no conflict, the findings of fact are reviewable under the manifest errorclearly wrong standard. Felice v. Valleylab, Inc., 520 So.2d at 924.
Only those findings of fault as to DOTD, Ponchatoula, and a phantom driver have been questioned in this appeal. The finding of fault of Cornish is not disputedonly the apportionment of that fault is questioned. DOTD contends that its trier of fact erred in finding that the state's negligence caused or contributed to the accident; rather, it argues that Cornish was solely at fault in causing this accident. Ponchatoula contends that its trier of fact erred in its fault findings as to it since the cattle guard did not present an unreasonable risk of harm, since custody and control of the cattle guard was with the state and not with it, and since it did not know that the cattle guard presented an unreasonable risk of harm to the motoring public.

Liability of DOTD
DOTD has a legal duty to the traveling public to maintain the highways and shoulders in a reasonably safe condition. Sinitiere v. Lavergne, 391 So.2d 821, 824-825 (La.1980). This duty "extends to the protection of those people who foreseeably may be placed in danger by an unreasonably dangerous condition." Id. It extends not only to prudent and attentive drivers, but also to motorists who are slightly exceeding the speed limit or are momentarily inattentive. Trahan v. State, Through Department of Transportation and Development, 536 So.2d 1269, 1273 (La.App. 3rd Cir.1988), writ denied, 541 So.2d 854 (La.1989). DOTD cannot knowingly allow a condition to exist which is a hazard to a reasonably prudent driver. In such cases, DOTD must take reasonable measures to eliminate or reduce the risks associated with the dangerous condition or may post adequate signs to warn the public of the danger, risk, or hazard involved. Id.
Although the highway did not appear to have any defects that would have caused Cornish to drive onto the shoulder, there was a consensus among the experts that the design of the shoulder immediately after the Hwy. 37 bridge and the slope of the shoulder near the cattle guard presented a danger to the traveling public that veered onto the shoulder which gave rise to DOTD's duty to warn of these dangers. Dr. Olin Dart, Jr., Cornish's expert in traffic engineering who viewed photographs of the scene and the accident report and performed an on-site investigation, testified the paved shoulder beginning at the bridge was six feet wide. At 150 feet from the bridge, the paved shoulder was three feet in width. At approximately 200 feet from the bridge, the paved shoulder tapered down to almost nothing. Andrew Edward Ramish, an accident reconstruction, highway safety and highway engineering expert for Cornish, testified that there were no road signs to warn that the paved shoulder would end. Although none of the experts nor the investigating state trooper was able to identify the exact point at which Cornish drove onto the shoulder after crossing the bridge, Cornish testified that he drove onto the shoulder when he was approximately half of the distance from the Hwy. 37 bridge to the cattle guard. Based on his testimony, it appears that Cornish drove onto the paved shoulder when it was no more that three feet wide, but probably a lot less than three feet. However, he testified that he was able to safely traverse the shoulder while attempting to reenter the road until he was "sucked" down into the cattle guard.
*1180 Dr. Dart testified that the slope of the shoulder increased from a four-to-one slope to a two-to-one slope as one approached the cattle guard. He opined that the change in slope could cause the car to pull to the right. Although Duaine Evans, Cornish's expert in accident reconstruction and traffic engineering, believed that a four-to-one slope was reasonable because it allows a driver to recover, he testified that DOTD was under a duty to protect the traveling public if the slope of the shoulder was any steeper than four-to-one. For example, Evans testified that DOTD should install guardrails to protect against any hazards located within 13 to 14 feet of the road. According to Evans, the slope of the shoulder prevented Cornish from returning to the road. Ramish agrees that a slope in excess of four-to-one makes it difficult for the driver, who strays onto the shoulder, to control a vehicle and bring his vehicle back safely onto the road. Therefore, he opined that the slope approaching the cattle guard was excessive and presented little chance of recovery. According to Ramish, the slope only served to enhance the danger presented by the existence of the cattle guard.
Entrances to, and exits from, private properties adjacent to the right-of-way of state highways may be regulated, prohibited, or abolished in the interest of the safety of the traveling public. LSA-R.S. 48:344. The state clearly has control over what is placed on the state right-of-way. According to Maurice Jordan ("Jordan"), DOTD's district maintenance engineer for the subject area, DOTD exercises such control by requiring a private landowner to obtain state permission for the installation of a driveway crossing. To obtain the state's permission, the landowner must apply for a permit. When an installation is made without prior approval, DOTD has the power to order the removal of an installation.
Regarding the permitting process for the installation of the cattle guard in this case, Eugene Holland ("Holland") obtained a permit from DOTD on December 30, 1977 authorizing the placement of a 42-inch culvert on the state right-of-way adjacent to his property.[5] Rather than installing a culvert to provide access to his property, Holland constructed the cattle guard in question. Although Holland testified that he obtained oral approval of the installation change from a DOTD employee, there was no writing to evidence such approval.
In the permitting process, the permittee is required to place a deposit with DOTD to insure compliance with the permit. This deposit is not returned to the permittee until the installation is inspected by appropriate DOTD personnel. The maintenance superintendent or the maintenance specialist has the duty of inspecting the installation upon notification of completion of installation. Regarding the inspection of the cattle guard, Jordan testified that he was unable to find an inspection report on this installation. Nonetheless, the permit was marked complete, and Holland's deposit was probably returned.[6] No one ever contacted Holland about removing this cattle guard. In other words, DOTD did not exercise its LSA-R.S. 48:344 powers and demand that this cattle guard be removed if such action would be in the interest of the safety of the traveling public.
After a review of the entire record and consideration of the particular facts of this case, we conclude that the record provides a reasonable factual basis for the trial judge's finding that DOTD was negligent and that DOTD's negligence was a cause-in-fact and legal cause of the accident. Moreover, we find that neither of these findings is manifestly erroneous.

Liability of Ponchatoula
Ponchatoula argues that its factfinder erred in finding that the cattle guard presented an unreasonable risk of harm or that the cattle guard was in its custody. It also *1181 contends that the finding of negligence was erroneous since there was no evidence that Ponchatoula knew or should have known that this cattle guard presented an unreasonable risk of harm to the motoring public.
For purposes of our analysis of the liability of Ponchatoula, we will assume, for the sake of argument, that the cattle guard presented an unreasonable risk of harm and that Ponchatoula had custody of the cattle guard.[7] In order for Ponchatoula to be strictly liable as a custodian of a thing that poses an unreasonable risk of harm, we must find that the thing (the cattle guard) was a cause-in-fact of the accident.
Regarding the determination of cause-in-fact, the "but for" test for factual causation is well recognized in Louisiana law and other states' jurisprudence. If the accident would have occurred irrespective of the fault of Ponchatoula (an assumed custodian of a thing that posed an unreasonable risk of harm), then its fault was not a cause-in-fact of the accident. Dixie Drive It Yourself System New Orleans Co., Inc. v. American Beverage Company, 242 La. 471, 137 So.2d 298, 302 (1962).
In making the "but for" inquiry, we must focus on whether Ponchatoula's fault was a cause-in-fact of the accident, being mindful that the injuries suffered by Cornish were the effect of the accident, not the cause of it. See Hammer v. City of Lafayette, 502 So.2d 301, 303 (La.App. 3rd Cir.1987). If the accident would not have occurred absent the fault of Ponchatoula, then Ponchatoula's fault was a cause-in-fact of the accident. Id.
The physical characteristics of Hwy. 37 are not unique; many Louisiana roads have narrow shoulders and steep roadside ditches and are lined with trees, culverts, fences and other objects. In this instance, that portion of the cattle guard involved in the accident was located approximately 11½ feet from the road. The cattle guard was located more than 200 feet from the point at which Cornish made a conscious decision to leave the road. Cornish lost control of his vehicle when he encountered the steepened shoulder as he approached the cattle guard. In particular, Cornish testified that the shoulder got very steep 50 to 60 yards from the cattle guard. As Cornish was trying to get back onto the road, he testified he was "sucked" down into the ditch and crashed into the cattle guard.
Even if the cattle guard posed an unreasonable risk of harm and Ponchatoula was a custodian for purposes of LSA-C.C. art. 2317, we find that the cattle guard was not a cause-in-fact of the accident, even though it might have been an instrumentality or contributing cause of Cornish's injuries. See Perkins v. State, Department of Transportation & Development, 515 So.2d 553, 555 (La. App. 1st Cir.), writ denied, 515 So.2d 1114 (La.1987); Hart v. Louisiana Power & Light Company, 486 So.2d 936, 938 (La.App. 1st Cir.), writ denied, 488 So.2d 1024 (La.1986). In other words, we find that Cornish's accident would still have occurred absent the assumed fault of Ponchatoula. Therefore, Ponchatoula is not liable, and the factfinder's determination to the contrary is manifestly erroneous. Based on this finding, we pretermit the issues of whether the cattle guard posed an unreasonable risk of harm and whether Ponchatoula was a custodian.[8]
Furthermore, we agree with Ponchatoula that the record does not provide a reasonable *1182 factual basis to support a finding that Ponchatoula was negligent, and we conclude that the jury's finding to the contrary was clearly wrong.

Phantom Driver
In addressing the fault of a phantom driver, the trial judge recognized the existence of a phantom driver; however, he expressly stated that he found that the fault of the oncoming unidentified vehicle was not a cause of the accident.
Cornish testified that he intentionally drove onto the shoulder of the road upon seeing an unknown approaching vehicle that he perceived to be travelling at least partially in his lane. His testimony was vague and uncertain as to the exact point at which he saw this oncoming car and the exact location or position of the unknown car relative to his vehicle as they travelled toward, and past, one another. There was no corroborating evidence as to the existence of a phantom car.
After a review of the entire record, this court concludes that the trial judge's finding that any fault of a phantom driver was not a cause of the accident was reasonable in light of the evidence presented and was not manifestly erroneous.[9]

Apportionment of Fault
The apportionment of fault under our comparative negligence scheme, or otherwise, is a factual determination which must be made once the fault of each party and causation have been established. Generally, this determination will not be disturbed on appeal unless it is clearly wrong. Efferson v. State, Through Department of Transportation and Development, 463 So.2d 1342 (La. App. 1st Cir.1984), writs denied, 465 So.2d 722 (La.1985). Since the issue of causation has been determined by this court, the respective degrees of fault attributable to the parties by each factfinder must first be analyzed by applying the manifest errorclearly wrong standard of review. If such a finding by the appropriate trier of fact is determined to be clearly wrong or manifestly erroneous, then it should be dismissed at the outset and a de novo review should be made. Also, if a particular finding is subject to determination by both triers of fact, then the elimination of one allows the other to stand alone, whereas the elimination of both findings negates any further analysis except to make a de novo review of the entire record as to that finding. However, if inconsistent reasonable findings remain, the Thornton II standard would apply. This analysis is subject, of course, to the condition that the total degrees of fault equal 100%.
We begin our analysis with a consideration of the apportionment of fault as to Cornish since this particular finding was subject to the determination of both triers of fact in their independent assessment of liability.
In this regard, we note that Cornish's fault was assessed at 25 percent and 15 percent by the jury and trial judge, respectively. DOTD and Ponchatoula contend that the factfinders erred in apportioning so little fault to Cornish in light of his intoxicated condition.
At some point after crossing the bridge, Cornish steered his vehicle to the right when he allegedly saw the headlights of a southbound unidentified vehicle and proceeded to travel partially on the shoulder for at least 200 feet. Cornish testified that he removed his foot from the accelerator and reduced his speed to 30 to 40 miles per hour as he travelled on the shoulder. The record is devoid of any evidence that Cornish took any other evasive action such as honking his horn, flashing his headlights, flashing his bright lights, or applying the brakes.
Cornish, self-described as a non-drinker, admittedly consumed an eight to ten ounce glass of cherry-bounce wine prior to having dinner with Johnson shortly prior to the accident. Cornish testified that he was not drunk, intoxicated, or impaired (due to his alcohol consumption) at the time of the accident. Johnson and David Cornish, who saw *1183 Cornish earlier on the evening of the accident, testified that Cornish did not appear intoxicated or impaired. On his arrival at the accident site, David noted that Cornish did not appear to be intoxicated. Nevertheless, the investigating officer, State Trooper Ronald Pierce, noted the smell of alcohol on Cornish's breath at the scene of the accident. Based on his suspicion that Cornish had been driving under the influence, Trooper Pierce went to the hospital to request that blood be drawn to determine Cornish's blood alcohol level. Paul Cobb, Jr., an employee of the Louisiana State Police Crime Lab, testified that the blood drawn some two hours after the accident produced a blood alcohol content result of .07 percent.
DOTD sought the assistance of Dr. Alfredo Swarez, a medical doctor specializing in pathology (which included toxicology), in determining Cornish's blood alcohol level at the time of the accident. In order to make this determination, Dr. Swarez utilized an extrapolation theory. Based on his extrapolation chart, Dr. Swarez concluded that Cornish's blood alcohol level was .13 percent at the time of the accident.[10] Dr. Swarez opined that Cornish's blood alcohol results were consistent with substantially higher consumption than admitted by Cornish.
Although some people may look okay at a.13 percent blood alcohol level, Dr. Swarez testified that studies have shown that alcohol consumption sufficient to raise a person's blood alcohol level to .13 percent produces a sustainable, substantial, and considerable effect on reactivity at this level. According to Dr. Swarez, a blood alcohol level of .13 percent would have an affect on a person's motor and sensory skills to the extent that a person's judgment, reflexes, ability to perform manual functions, and ability to perceive oncoming vehicles would be really impaired. All of these factors affect one's driving ability by decreasing it markedly.
The evidence showed that Cornish was not a newcomer to Hwy. 37. In his impaired condition, Cornish drove onto the shoulder upon perceiving that an oncoming car was traveling in his lane. It is clear that this accident would not have happened but for Cornish's decision to steer onto the shoulder of the road. Based on the factfinders' apportionment of fault to Cornish, it is obvious that both factfinders found that Cornish was at fault for leaving the road, especially in light of the trial judge's finding that the phantom driver was not a cause of the accident.
Cornish's actions in driving onto the shoulder because of driver error, intentional actions, or inattentiveness, due largely (if not exclusively) to his impaired condition, was the precipitating cause of the accident. Once on the shoulder, there was no evidence that Cornish attempted to apply his brakes. Rather, Cornish proceeded to travel at least 200 feet on the shoulder while attempting to reenter the road when he was pulled into the cattle guard due to the steepness of the slope of the shoulder.
In determining apportionment of fault, the court should consider the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages. The factors to be considered include (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Casualty Insurance Company, 469 So.2d 967 (La. 1985).
After considering all of the factors listed above and the respective duties and fault of the parties as discussed herein, it is clear that both the trial judge and the jury had no reasonable factual basis to find that Cornish was any less than 50% at fault in causing the accident. Additionally, in light of our conclusions, we find that the jury's apportionment of Cornish's fault at only 25% and the trial judge's apportionment of 15% *1184 are both clearly wrong. Since this finding of both triers of fact has been eliminated as clearly wrong, we now make a de novo review of the record as to the degree of fault attributable to Cornish. We find that the appropriate percentage is 50%.
As noted earlier, the trial judge was the sole factfinder regarding DOTD, and he apportioned 50% of the fault to DOTD. We find that the record provides a reasonable factual basis for such a finding and that this finding was not manifestly erroneous.[11]

Quantum
The amount of damages assessed by the trier of fact should not be disturbed unless the appellate court's examination of the facts reveals a clear abuse of the "great," and even vast, discretion vested in the trier of fact. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993).
With respect to the varying damage awards in this bifurcated case, we proceed to determine whether the factfinders abused their vast discretion in awarding damages. See Thornton I, 341 So.2d at 1142-1143. In the event that this court finds that the awards by both factfinders as to any particular element of damages are abusively high or abusively low, this court is free to evaluate the facts de novo, and make an award under the constraints of Reck v. Stevens, 373 So.2d 498, 501 (La.1979). If in initially applying the abuse of discretion test to awards, this court concludes that one of the factfinders abused its discretion as to a particular award, but the other has not, then we are free to disregard the award by the factfinder who abused its discretion. In other words, we would eliminate the abusively high or abusively low award and be left with only one reasonable award. In the two previously mentioned scenarios, there would be no need for this court to apply the additional standard of review established in Thornton II because we would not have reasonable awards that are inconsistent. In the event that this court finds that the awards by both are within the vast discretion of the factfinder, we must then harmonize the awards by applying the standard established in Thornton II which requires that we determine which award is the "more reasonable measurement." See Thornton II, 348 So.2d at 82.
DOTD and Ponchatoula contend that both factfinders abused their discretion in awarding damages for lost wages and general damages. Ponchatoula also contests the award for future medical expenses.
A. Future medical expenses.
The jury awarded $40,000 in future medical expenses, but the trial judge awarded $30,000. Ponchatoula argues that the jury award was an abuse of discretion since the only testimony on this issue revealed that Cornish was going to need a hip replacement with costs that might range between $20,000 and $30,000. Based on this evidence, Ponchatoula urges this court to disregard the jury's award and find that the trial judge's finding is more reasonable.
Future medical expenses, like any other damages, must be established with some degree of certainty. The plaintiff must show that, more probably than not, these expenses will be incurred. Veazey v. State Farm Mutual Auto Ins., 587 So.2d 5, 8 (La.App. 3rd Cir.1991).
Regarding Cornish's entitlement to future medical expenses, the test is whether Cornish has shown through medical testimony that, more probably than not, subsequent medical treatment is necessitated by the trauma suffered in the accident. Wells v. Allstate Insurance Co., 510 So.2d 763, 769 (La.App. 1st Cir.1987). Dr. Reginald B. Griffith, Jr., an orthopedic surgeon who had been one of Cornish's treating physicians, opined that Cornish's hip condition would progressively become worse. As a result of this progression, Dr. Griffith believed that it was more probable than not that Cornish would need hip replacement surgery if he lived a normal life expectancy.
*1185 This court finds that the record provides a reasonable factual basis for the factfinders' finding that Cornish proved by a preponderance of the evidence that he would incur future medical expenses because of injury caused by the accident. Therefore, the factfinders were not clearly wrong in awarding Cornish an amount for future medical expenses.
According to Dr. Griffith, the costs of the necessary hip replacement surgery would exceed $20,000. When asked more directly, Dr. Griffith testified that the costs of the surgery would range between $20,000 and $30,000. The record is devoid of evidence as to any other future medical expenses that may be incurred by Cornish. Based on the testimony of Dr. Griffith and the absence of any other pertinent evidence on this issue, this court finds that the most a trier of fact could have awarded for future medical expenses is $30,000. Since the jury's award exceeds this amount, we find a clear abuse of discretion, and we are left with only one award that is not abusivethe trial judge's award. Therefore, the trial judge's award of $30,000 is the proper award for future medical expenses.
B. Lost wages (past and future).
The jury fixed Cornish's past lost wages at $65,000 and his future lost wages at $400,000. On the other hand, the trial court awarded Cornish $103,000 in past lost wages and $500,000 in future lost wages.
Cornish reported a $2,096 loss on his 1988 federal income tax return. Nevertheless, through the testimony of his certified public accountant, C. Terry Sibley, Cornish argues that his actual net profit from his trucking business was substantially greater than that reflected on his tax return. After examining Cornish's business records and disregarding all transactions that appeared to be of a non-business nature, Sibley concluded that Cornish's net profit, after business expenses, was $38,511 for the period of January 1, 1988 to December 9, 1988. At this rate, Cornish would earn $40,981 in wages annually.
Ponchatoula contends that Sibley's procedure for calculating Cornish's wages was arbitrary. Ponchatoula urges this court to focus on the income reported on his income tax return for purposes of determining Cornish's lost wages. On the other hand, DOTD contends that the trial court should have focused on Dr. Randolph Rice's expert testimony regarding minimum wage calculations to arrive at lost wages, which would have produced figures of $125,772 (future) and $22,100 (past).
Based on the annual income figure arrived at by Sibley, Dr. Randolph Rice, an expert economist, calculated Cornish's past lost wages to be $103,856. Using a work life expectancy of 18.52 years, a cost of living increase of 5% and a rate of return of 8%, Dr. Rice calculated Cornish's future lost wages to be $583,063. These calculations were based on the underlying assumption that Cornish was unable to return to any gainful employment. In assuming that Cornish was capable of performing at least minimum wage employment, Dr. Rice testified that Cornish's annual earnings at a minimum wage job would be $8,840. During his work life expectancy of 18.52 years, Dr. Rice opined that Cornish would earn $125,772. At such an earning level, Cornish would sustain future lost wages in the amount of $457,291.
Both factfinders appear to have accepted Sibley as a credible witness. We infer from the awards given by each that they believed that Cornish's income tax return did not accurately reflect Cornish's actual earnings. Thus, the factfinders' decision to credit the testimony of Sibley was not manifestly erroneous or clearly wrong. See Rosell v. ESCO, 549 So.2d at 845.
Dr. Griffith opined that Cornish was unable to return to his former job. Hesitantly, Dr. Griffith testified that Cornish might be only capable of very sedentary or light work that would not require a lot of standing or lifting and would not require any climbing, kneeling, squatting, or repetitive use of the left leg. Such employment would have to consist mostly of sitting and very little standing.
Regarding the availability of a job that fell within these restrictions, Curtis Charriere, *1186 vocational rehabilitation expert, opined that Cornish was unemployable because he had no transferable skills, he had a mental inability to learn (difficulty with reading and writing), and he was taking prescription medication. Considering Cornish's work history, mental abilities, and anatomical disability rating of 50% in the left lower extremity, Charriere testified that no jobs were available in the New Orleans/Slidell area.
The variation in the awards for lost wages appears to be based on the factfinders' findings regarding Cornish's ability to return to some type of employment. The trial judge's awards for past and future lost wages indicate that the trial judge did not believe that Cornish was capable of returning to any type of employment. On the other hand, the jury's awards reveal that the jury believed that Cornish was capable of at least a minimum wage job. We cannot say that the findings of either in this regard are unreasonable or manifestly erroneous.
Since the record provided a reasonable basis for either conclusion, we find that neither factfinder abused its vast discretion in awarding damages. Therefore, we are required to apply the "more reasonable measurement" test to the evidence in this case. See Thornton II, 348 So.2d at 82. After a thorough review of the entire record, we find that the trial judge's awards for past lost wages and future lost wages are more reasonable than those of the jury.
C. General damages.
DOTD and Ponchatoula essentially contend that the total jury award of $425,000 and the $750,000 award by the trial judge for general damages (pain and suffering, disability, and loss of enjoyment of life) are excessive. This court must first determine if the amounts awarded by the triers of fact for general damages were an abuse of its vast discretion. See Youn v. Maritime Overseas Corp., 623 So.2d at 1261.
It is obvious that Cornish was involved in a serious accident and sustained severe injuries. He testified that he was trapped in his vehicle for one to one-and-one-half hours prior to being extricated by a rescue team. Throughout this time, he was in great pain and feared that his vehicle would catch on fire.
Cornish sustained a fracture dislocation of the left hip with a fracture of the femoral head in this accident. Additionally, he had a laceration of the left lower leg, a femoral shaft fracture of the right leg, severe facial lacerations, injury to his left knee, and a very bad laceration to his lower lip and the alveolar mucosa of the mandibular and maxillary areas with several fractured or missing teeth.
Cornish was initially hospitalized for 18 days of which several were spent in the intensive care unit. During this time, he was in extreme pain and confined to the hospital bed. Cornish continued to experience pain once he was released from the hospital, and was confined to a hospital bed and wheelchair when he returned home. He engaged in physical therapy which caused even more pain. Cornish's complaints of pain are corroborated by the testimony of his wife, who cared for Cornish on a continual basis. Shirley Cornish testified that she had to do almost everything for him for three to four months after the accident. Since the accident, Shirley observed that Cornish was depressed about sexual relations, was under a financial strain, was unable to do things with his minor child and around the house, and had low self esteem. Cornish's complaints of pain and depression were also corroborated by the testimony of Roas Jones, his neighbor.
Cornish has undergone multiple surgical procedures which include closed reduction of the left hip; stabilization procedure on the right femur; insertion and removal of pins in his right leg; arthrotomy of the left hip which revealed ligamental instability of his left knee; an arthroscopy to his left knee; surgery on the lip to repair damage caused by the laceration; and replacement of four teeth.
Medical evidence reveals that he had a chronically unstable left knee which was going to lead to accelerated degenerative changes and other complications in the knee. Although Cornish had experienced some improvement within ten months post-accident, he still experienced restricted range of motion in both knees (more so in the left knee). *1187 Dr. Griffith felt that Cornish's left knee had subluxed backwards or had become partially dislocated or partially dislocated backwards, due in part to immobilization of the left femur during his initial hospitalization but primarily due to the severity of his injuries. According to Dr. Griffith, Cornish's right femur was healed within ten months after the accident. However, Dr. Fambrough, an orthopedist who began treating Cornish the day following the accident, and Dr. Griffith opined that it was probable that Cornish will require hip replacement surgery at some point in the future due to the condition of his left hip. Dr. David Doan, an ear, nose and throat surgeon who performed surgery on Cornish's lip, opined that Cornish suffered from some minor motor and sensory nerve damage. Dr. Doan testified that if Cornish was still experiencing residual nerve damage after two years, his condition was probably permanent. Additionally, as a result of the condition of his lip, Cornish's lip drooped.
Approximately one-and-one-half years after the accident, Cornish continued to experience significant discomfort in his left hip which caused him to walk with a limp, and he still experienced some loss of range of motion in both knees. X-rays showed a defect in the femoral head and arthritic changes in the left hip. Based on these x-rays and Cornish's medical history, Dr. Griffith opined that Cornish would need a hip replacement in the future because of complications with his left hip (presence of chipped fragments and deformity to the femoral head).
According to Dr. Griffith, Cornish had a small amount of anatomic disability (no more than 10%) in his right leg secondary to his restriction of motion of his right knee, and he had significant disability secondary to the loss of motion of his left knee, the loss of motion in his left hip, and the fact that his left hip was incongruent. Dr. Griffith testified that Cornish's anatomical disability on his left lower extremity was close to 50%. In all likelihood, Cornish's condition would not improve since it had reached maximum medical improvement.
In light of the nature, extent, and duration of Cornish's condition, his continuing pain and disability, and the effect of his injuries on his lifestyle, we find that neither factfinder abused its vast discretion in awarding general damages. We now must reconcile the conflicting damage awards in this bifurcated trial and determine which award, the trial judge's or the jury's, is the "more reasonable measurement" of Cornish's general damages.
After a thorough review and consideration of the entire record, we find that the jury's award of $425,000 is more reasonable than that of the trial judge.

Decree
For the foregoing reasons, we affirm that portion of the judgment in which the trial judge found DOTD 50% at fault; we reverse and set aside that portion of the judgment in which the trial judge found Cornish 15% at fault and the jury found Ponchatoula 25% at fault and Cornish 25% at fault.[12] In light of our determination as to causation, fault is apportioned as follows: 50% to DOTD and 50% to Cornish. We vacate that portion of the judgment of the trial judge as to general damages (pain and suffering, disability, and loss of enjoyment of life). We vacate that portion of the judgment incorporating the jury's award for future medical expenses, past lost wages, and future lost wages. The judgment of the trial court is affirmed in all other respects. Accordingly, the resulting judgment will be as follows:

past medicals $ 54,101.38
future medicals 30,000.00
past lost wages 103,000.00
future lost wages 500,000.00
general damages 425,000.00
loss of consortium 50,000.00

This judgment is subject to a reduction for Cornish's comparative fault. Costs of this appeal are assessed to the Cornishs and DOTD equally. That portion of the costs to be paid by DOTD is $1,127.86.
*1188 AFFIRMED IN PART; REVERSED IN PART; AND VACATED IN PART.
NOTES
[1] Cornish had not worked earlier that day because he was between hauling jobs. He had finished a hauling job for Heck Industry the day before and was waiting for another job assignment from Heck Industry.
[2] The cattle guard was constructed on the state right-of-way by a predecessor-in-title to Ponchatoula to enable the owners to access adjacent property. It was located more than 450 feet from the previously mentioned bridge.
[3] This court notes that the fourth circuit has adopted a different approach to reviewing inconsistent findings in a bifurcated trial. The fourth circuit's approach requires that the appellate court make an independent review of the record without according any weight to the conclusions of either the jury or the trial judge where inconsistencies exist in the findings of the jury and the trial judge. Carr v. City of New Orleans, 626 So.2d at 376; McCullough v. Regional Transit Authority, 593 So.2d at 735-736.
[4] As more succinctly stated in brief by counsel for the Cornishs, the additional standard established by this court does not render the appellate court powerless to correct and remedy findings and conclusions of both triers of fact if both are clearly wrong. The Thornton II mandate was not intended to totally negate the appellate court's constitutional powers and the authority vested in it by LSA-C.C.P. art. 2164 to "render any judgment which is just, legal, and proper upon the record on appeal."
[5] Holland was a predecessor-in-title to Ponchatoula and was serving as sheriff at that time.
[6] According to Gene Fekete, a DOTD maintenance employee, DOTD does not mark the permit complete, or refund a deposit, until the installation has been approved as complying with the permit.
[7] Although we make this assumption for sake of argument, we note there is jurisprudence to the contrary. For example, in Rogers v. Parish of East Baton Rouge, 577 So.2d 1068, 1071 (La. App. 1st Cir.), writ denied, 580 So.2d 925 (La. 1991), this court found that a culvert/headwall located 10 to 12 feet from the road and in the ditch did not create an unreasonable risk of harm to others.
[8] However, we believe this finding in this case is just and proper in light of the need, utility and common practice of locating such crossings within the state right-of-way near the travelled portion of streets and roads. To hold otherwise would subject everyone, who owns property adjacent to a state right-of-way which contains an open drainage ditch, to liability simply because they are in need of an entrance to their property. Such an automatic imposition of liability would be absurd, especially where the accident is caused primarily, if not solely, as a result of an alcohol impaired motorist. Moreover, there was no reasonable alternative location for such a crossing that would have reduced the risk of harm.
[9] This court submits that any fault of a phantom driver should have been presented to the jury for consideration and determination. Although the trial judge erred in failing to inquire of the jury on its verdict form, we find that any such error was harmless in light of the evidence presented.
[10] If the tested blood was taken two and one-half hours after the accident (rather than two hours), Dr. Swarez explained that Cornish's blood alcohol level would have been approximately .12 percent (rather than .13 percent) at the time of the accident.
[11] Based on the findings that Ponchatoula's assumed fault was not a cause-in-fact of the accident and that Ponchatoula was not negligent, apportionment of fault as to Ponchatoula was not proper in this case.
[12] Although the apportionment of fault by the trial judge as to Ponchatoula and the apportionment of fault as to DOTD by the jury had no binding legal effect, nevertheless, we also vacate these findings for clarification purposes,