341 So.2d 1136 (1976)
Frank L. THORNTON et al., Plaintiffs-Appellees,
v.
Sharon MORAN et al., Defendants-Appellants. Sharon MORAN, Plaintiff-Appellee,
v.
Frank L. THORNTON et al., Defendants-Appellants.
Nos. 10952, 10953.
Court of Appeal of Louisiana, First Circuit.
December 20, 1976.
Rehearing Denied February 14, 1977.
Writs Granted March 31, 1976.
*1138 Arthur H. Andrews and James E. Moore, Baton Rouge, of counsel for Price A. K., Inc.
Dermot S. McGlinchey and Frederick Alexius, New Orleans, of counsel for Chrysler Corp.
Henry L. Klein, Hugh C. Uhalt, New Orleans, of counsel for Sharon Moran.
David W. Robinson, Michael C. Palmintier, Paul H. Due and Richard Dodson, Baton Rouge, for G.E.I.C.
Robert F. Kennon and John S. White, Baton Rouge, of counsel for Frank Thornton et al.
Before SARTAIN, COVINGTON and LOTTINGER, JJ.
SARTAIN, Judge.
The accident giving rise to these suits occurred at approximately 5:20 p.m. on the Airline Highway near Gonzales, Ascension Parish, Louisiana, when a 1966 Volkswagen ran into the rear of a 1972 Chrysler automobile. The Volkswagen was owned and operated by Sharon Moran. The Chrysler automobile was owned and operated by Frank L. Thornton. Mrs. Thornton was a guest passenger in the vehicle operated by her husband.
Mr. and Mrs. Thornton filed suit against Sharon Moran (who was uninsured); their liability insurer, Government Employees Insurance Company (GEIC) under the uninsured motorist provisions of their policy; Price-A.K., Inc.; and Chrysler Corporation. The suit against Miss Moran is grounded on specified acts of negligence. The charges against Price-A.K., Inc. and Chrysler Corporation are based on negligence and breach of warranty. Miss Moran filed a general denial and a reconventional demand, adopting by reference allegations contained in her suit, below. GEIC filed an answer in the nature of a general denial, admitted UM coverage, but alleged that the accident was the result of a malfunction in the Chrysler vehicle and asserted a third party demand against Price-A.K., Inc. and Chrysler Corporation. These latter two defendants filed general denials and set forth the claim that the accident was the sole result of the negligence of Thornton. This suit bears No. 164,596 on the docket of the district court and will be hereinafter referred to as the Thornton Suit.
Miss Moran's suit is against Frank L. Thornton; his liability insurer, GEIC; Price-A.K., Inc.; its liability insurer, United States Fire Insurance Company;[1] and Chrysler Corporation. Thornton and GEIC *1139 filed general denials and third party claims against Price-A.K. and Chrysler Corporation on identical grounds to those set forth in the Thornton Suit, above. In her petition, Miss Moran asked for trial by jury. Her suit bears No. 172,065 on the docket of the district court and will be hereinafter referred to as the Moran Suit.
These two suits were consolidated for trial. The Thornton Suit was tried to the judge. The Moran Suit was tried to the jury. It was stipulated that the third party demands in the Moran Suit would also be tried to the judge.
In the Thornton Suit the trial judge, for written reasons assigned, found that Mr. Thornton was negligent but that Miss Moran had the last clear chance to avoid the accident. The judge a quo also found in favor of the defendants, Price-A.K., Inc. and Chrysler Corporation, and dismissed all third party demands. Accordingly, judgment was rendered and signed in favor of Mr. Thornton and against Sharon Moran and GEIC, in solido, in the sum of $750.00 for personal injuries, and against Sharon Moran, individually, in the sum of $1,993.50 for special damages. Judgment was rendered in favor of Mrs. Thornton for personal injuries in the amount of $7500.00 against Sharon Moran and GEIC limiting the latter's liability to $5,000.00, the amount of its UM coverage. Judgment was further rendered in favor of GEIC against Sharon Moran in the sum of $5,750.00, representing the awards to Mr. and Mrs. Thornton for their respective personal injuries. GEIC was further awarded judgment in the amount of $1,491.14, against Mr. Thornton, but payable out of the $1,993.50 awarded to the latter.
In the Moran Suit, the jury reached the opposite result with respect to negligence on the part of Miss Moran. It, like the trial judge, found Mr. Thornton to be negligent; but unlike the trial judge, it found Miss Moran to be free of negligence. It entered a general verdict in her favor for general damages in the amount of $90,000.00. The jury also found that Price-A.K., Inc. and Chrysler Corporation were not negligent. In conformity with these findings judgment was signed in her favor against Frank L. Thornton and GEIC, in solido, in the amount of $90,000.00 together with legal interest thereon from date of judicial demand until paid, but limiting GEIC's liability to $50,000.00, the amount of its policy limits and interest on the excess from date of judgment until paid, and for all costs.
In both suits all defendants cast have appealed.[2] In addition, Mr. and Mrs. Thornton have answered the appeal in their suit seeking an increase in the amounts awarded to them for personal injuries, the stacking of uninsured motorist protection of the GEIC policy as to Mrs. Thornton's award, and for the modification of the interest due on the amount awarded Miss Moran in the event that the same is affirmed or amended if the same is in excess of their policy limits.
We now turn to the facts in the case and quote the testimony considered relevant as set forth by the trial judge in his written reasons for judgment: viz.
"Frank L. Thornton:
He purchased a Chrysler automobile from Price-A.K., Inc., on August 8, 1972 after driving it; he went back on the 9th to pick up the automobile. He checked all the lights, turn signals and blinkers; then he started the automobile, drove it to a gas pump and started it again after it was filled with gasoline. He drove it to the edge of the highway, stopped, looked both ways, saw nothing coming, and then drove across the two Gonzales bound lanes and the neutral ground, turned toward Baton Rouge and had got straightened out when the engine died, bringing him to a stop about fifty feet from the neutral ground he had just traversed. He put the automatic transmission into neutral and tried to restart the engine while his wife turned on the caution blinkers. He had put on the *1140 lights prior to driving off. He estimates that he had been stopped thirty seconds before he was struck in the rear by Miss Moran's vehicle, which he never saw prior to the impact. He heard no horn or squealing of brakes nor had any other warning of the impending accident. He never looked back either directly or through his mirrors, his attention being directed to restarting of the vehicle. He had reached a maximum speed of fifteen miles per hour prior to the stalling. He estimates the distance between the point of impact and the final resting place of his car to be 165 feet.
Mrs. Myrtis Thornton:
She was a passenger in the automobile both when the car was test driven on August 8, 1972, and on the day of the accident. The car's lights were put on prior to driving away from Price-A.K., Inc. Her husband stopped before entering the highway; both he and she looked for traffic. She saw none approaching. Her husband drove across the southbound lanes and the neutral ground and turned left toward Baton Rouge in the left lane, never attaining any fast rate of speed. The car stopped and her husband said, `It stopped.' She turned on the caution flashers because she saw the button. He kept trying to start the car; she could hear it turning over. She agrees with the estimate of thirty seconds between the stopping and the impact.
Sharon Moran:
She left her mother's home in Gonzales about 5:00 or 5:15 P.M. and was driving a 1966 Volkswagen station wagon toward Baton Rouge at about fifty-five miles per hour in the left lane. She saw the Thornton vehicle crossing the southbound lanes and entering the neutral ground. She assumed he would stop but `let up' on the accelerator `just for caution.' However, Thornton just kept coming on out in front of her. She had time to apply the brakes but the impact occurred right after she slammed on the brakes. She was conscious of traffic to her right; so, just after the rear end of the Thornton vehicle cleared the neutral ground she veered to the left toward the neutral ground. The Thornton car was not stopped, not to my knowledge. She saw no car lights or blinkers on. Just as he got straightened out from the neutral ground, `I hit him.' The accident occurred at sundown, `in the process of going down.' She was facing the sun. She admitted that in her deposition taken previously she had stated she saw the Thornton car while a couple of blocks or a quarter of a mile away, `far enough away to be conscious of the situation,' and that the Thornton car stopped in the neutral ground but now she thinks he did not stop. She doesn't think she lost any speed, or at least very much, by taking her foot from the accelerator. After she resumed her speed the Thornton car just travelled through the neutral ground and out into the highway. She started applying the brakes before Thornton got into her lane.
Stanley Frederic:
He was approaching the Toyota building from Baton Rouge, intending to turn right. He saw the Chrysler come out. After looking to the right he looked back and saw the Chrysler hit, even though he never saw the Volkswagen. The Chrysler was just straightened out in the highway and he did not see the Chrysler stall. It was just a matter of seconds between the Chrysler entering the Baton Rouge bound lanes and the impact. He saw no lights at all. He remembers the weather as misting and the time as dusk.
Russell Sentilles:
An employee of Price-A.K., Inc., on the day of the accident, he wasn't aware of any allegation that the engine had died until a week or ten days after the accident. The wrecked Chrysler was taken in trade on another vehicle, was repaired and used as a demonstrator. The repairs consisted of body repairs, but no mechanical work or adjustments.
Benny Drago:
He was in charge of new car preparation in the service department on the day of the accident. He test drove the vehicle on that day and found nothing wrong. He was not aware of any mechanical repairs made on *1141 the wrecked vehicle which was used several months as a demonstrator after body repairs were made.
Donald E. Balhoff:
He is the present operator of the 1972 Chrysler which was purchased about April, 1973. He has had only one instance of the car stalling, about August, 1973. He had to have help in getting it restarted but no mechanical adjustments were made.
James Robinson:
As new car service manager for Price-A.K., Inc., in August, 1972, he checked the car visually and test drove it prior to delivery to the customer and found no indication of any defect. No mechanical repairs were made on the car after the accident.
Dr. Leonard C. Adams:
Accepted as an expert, he testified to numerous possibilities as to causes of stalling, but frankly admitted he had not examined the car and so had no opinions as to what occurred.
Herman B. Ferguson:
As a salesman for Price-A.K., Inc., he drove the Chrysler three to four months as a demonstrator and had no difficulties with it.
Donald C. Firby:
Qualified as an expert in automotive wiring, he testified in regard to possibilities, but he too had not examined the car and could add little to the evidence in the case.
Price LeBlanc's testimony added little. A trooper, Ira B. Sappington, also testified but could testify to little. Unfortunately, Aaron Duke, the investigating officer, was deceased at the time of trial."
The trial judge then concluded:
"After considering all the evidence, above summarized, the Court has little hesitancy in finding that Sharon Moran was negligent under the circumstances. By her own testimony she saw the Thornton car while some distance, whether 600 feet or a quarter of a mile is immaterial, and admitted that she was made aware of the situation. It is immaterial, too, whether or not the Thornton car stopped in the neutral ground. It was established to the Court's satisfaction that the Thornton's car attained a maximum speed of fifteen miles per hour. The Court finds that Miss Moran was driving at about fifty miles per hour. The point of impact, the Court finds to be no less than fifty feet from the break in the neutral ground. Thus while the Thornton car was travelling the fifty feet, the Moran car was travelling a distance of between 167 and 350 feet depending upon the average speed ascribed to the Thornton car. The absence of skid marks or accepting her testimony that she did apply the brakes but hit the Thornton car simultaneously with the effectiveness of the brakes convinces the Court that she was guilty of negligence.
The Court, however, also has little hesitancy in finding that Mr. Thornton was guilty of negligence. The Court cannot accept as freedom of negligence his failure to stop in the neutral ground to see if there was approaching traffic. It is true that he stopped before entering the highway, but the two southbound lanes and the neutral ground constitute a considerable distance which, by his own testimony, he was traversing at a slow speed.
The Court cannot accept the testimony that the car stalled and was stopped for a period of thirty seconds. If it stalled at all, on which the Court does not feel required to make a definite finding, it could not have been for such a period of time to constitute an intervening cause sufficient to free Mr. Thornton of liability for negligence in entering the highway in front of oncoming traffic near enough to alert him to the danger therefrom. The stall, if any, would not be a cause of the accident.
This leaves for consideration the question of application of the doctrine of last clear chance. Study of the testimony above summarized convinces the Court that Miss Moran was presented with an opportunity to avoid the collision when she saw or should have seen the dangerous situation at a time when Thornton was unable to extricate himself therefrom.
*1142 This finding obviates any necessity of inquiring into the possible contributory negligence of Mrs. Thornton."
* * * * * *
These cases present a novel situation. There were two triers of fact in the trial court, the jury (Moran) and the judge (Thornton). Based on common issues of law and facts the results reached are contradictory. Appellate review under these circumstances is rendered more difficult because in the cause tried to the judge we have his findings of fact and conclusions of law; whereas, in the cause presented to the jury there are no findings of fact but only conclusions. Confronted with this problem, we are resolved not to be influenced by what would appear to be a tendency to seek uniformity. A consistent result is expected from a single trier of fact. In delictual matters inconsistent results from separate triers of fact, while most unusual, are not beyond the realm of possibility. The mythical "reasonable man" is just that diverse. Lawsuits are won and lost on personalities and often crucial determinations hinge on a matter of seconds, inches or feet. Accordingly, we shall view these consolidated cases separately and the decision reached in each shall not be disturbed absent a finding of manifest error. Canter v. Koehring, 283 So.2d 716 (La.1973); Ashley v. Nissan Motor Corporation in U.S.A., 321 So.2d 868 (1st La.App., 1975), writs refused, La., 323 So.2d 478. If the results reached in these cases after our review remain contradictory or should they conform one to the other, so be it.
In this context, we wish to note that the following language from Canter, above, is now appearing in practically every case involving contested issues of fact. 283 So.2d 716, 724:
"When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." (citations omitted)
It is argued that Canter espouses a new doctrine of manifest error, even to the extent that "if there is any evidence in the record over which reasonable men may disagree" an appellate court should not reverse. We do not construe Canter as effecting any change in the traditional concept of manifest error. We do construe Canter as being a reminder to the appellate bench that where the record contains facts upon which one or more reasonable conclusions may be reached the conclusion reached by the trier of fact should not be substituted by an equally reasonable conclusion of a reviewing court. This is particularly true in matters involving the credibility of witnesses.
Returning to the matter before us: The controversy here could be readily resolved if a reasonably clear factual situation could be determined from the evidence. The issue is the negligence vel non of the two drivers. The divergence of opinion between the two triers of fact reflects their difference in the evaluation of and the weight given to the same testimony.
We do not find that a factual situation can be established by us to the extent that the same would be more reasonable than that urged by either one of the drivers or that we should under the circumstances here presented adopt one of the versions to the exclusion of the other's version. Our review of the record and the testimony, above, satisfies us that the record contains sufficient evidence to furnish a reasonable *1143 factual basis to support the conclusions reached by each trier of fact. Canter, above.
R.S. 32:124 imposes a duty on a motorist who is about to enter a highway from a driveway (break in the median) "shall yield the right of way to all approaching vehicles so close as to constitute an immediate hazard." The highway at the scene of the accident consists of four lanes, two for northbound and two for southbound traffic. The north and southbound lanes are separated by a grass median as wide or wider than two traffic lanes. The break in the median is directly across from the driveway leading to Price-A.K., Inc. Mr. Thornton looked to the north and south as he left the driveway to cross the southbound traffic lanes. But by his own admission he did not again look to the south (his right) as he traversed the median or just before he turned north. His counsel argues that the Moran vehicle at this juncture presented no hazard to him. The jury thought differently. Miss Moran's vehicle was as equally visible to Thornton as was his vehicle to her.
Counsel for Mr. Thornton contends that the trial judge erred in his failure to specifically find that the Chrysler had stalled. Our appreciation of the trial judge's conclusion on this point is that if the Chrysler vehicle had stalled, it had not remained immobile for thirty seconds. Additionally, Mr. Frederic's testimony, above, that the accident occurred "seconds" after the Chrysler entered the northbound lanes substantially reduces the time interval between the left turn maneuver and the collision. Based on these factors, we do not find manifest error in the conclusion reached by the trial judge as to Mr. Thornton's negligence.
With respect to Miss Moran's negligence and the applicability of last clear chance doctrine, our law is very clear. For this doctrine to apply three essential elements must exist: (1) the person (Thornton) invoking the doctrine was in a position of peril from which he was unaware or from which he was unable to extricate himself; (z) that the person (Moran) against whom the doctrine is invoked actually discovered or could and should have discovered the other's peril; and (3) that following discovery of the peril there remained sufficient time for the person against whom the doctrine is invoked to have avoided the accident by the exercise of reasonable care. Travelers Indemnity Company v. Ben, 269 So.2d 553 (1st La.App., 1972).
While the trial judge in his reasons for judgment did not "feel required" to make a definite finding as to whether the Chrysler actually stalled, he did conclude that (1) the Thornton vehicle was in a position of peril after it had turned into the northbound lanes; (2) that Miss Moran was "aware" of the situation; and (3) that she had sufficient time to avoid the accident. We concede that Miss Moran had every right to expect that the Thornton vehicle would stop in the break in the median before executing a left turn. Nonetheless, after the execution of this maneuver and during the period of time it took the Chrysler vehicle to travel fifty feet, Miss Moran's vehicle had traveled a distance of 167 to 350 feet. The judge a quo also reasoned that the absence of skidmarks from the Moran vehicle was indicative of inattention on her part. We find this to be a reasonable conclusion. The presence of skidmarks has been considered as evidence tending to show that a driver took appropriate action to avoid a collision but had insufficient time in which to do so. Musco v. General Guaranty Insurance Company, 181 So.2d 881 (4th La.App., 1966); Carter v. Connecticut Fire Insurance Co., 189 So.2d 724 (1st La.App., 1966).
Also relevant to the issue of Miss Moran's lack of attention to the roadway ahead of her and her failure to see that which she should have seen are the prior inconsistent responses she made during pretrial discovery to the effect that the Thornton vehicle had stopped in the neutral ground. Considering the above factors we are not disposed to say that the trial judge committed manifest error in his conclusion that Miss Moran could have avoided the accident and therefore the judgment based *1144 on the doctrine of last clear chance should be permitted to stand.
With respect to the liability of Price-A.K., Inc. and Chrysler Corporation, the jury and the district judge found that the parties claiming a defect in the Thornton vehicle failed to prove the presence of such a defect. With these conclusions we concur.
We turn now to the various awards for personal injuries.
Mr. and Mrs. Thornton contend that the awards of $750.00 and $7,500.00, respectively for personal injuries sustained by them are manifestly inadequate and should be increased to $2500.00 to Mr. Thornton and $15,000.00 to Mrs. Thornton. We concede that the injuries as set forth in the above written reasons are somewhat understated and the awards are possibly on the low side. However, we do not find these awards to be so inadequate as to constitute an abuse of the discretion accorded the trial judge in his assessment of damages. C.C. Art. 1934(3).
It is urged that the award of $90,000.00 to Miss Moran is grossly excessive and should be reduced to the sum of $30,000.00. Her injuries may be described as follows: Immediately following the accident she was taken to a hospital in Gonzales, Louisiana, and then to the Baton Rouge General Hospital in Baton Rouge. She was seen by Dr. Herbert K. Plauche, an orthopedic surgeon. He described her injuries as a moderately severe (more than two pieces) comminuted fracture of the right femur (thigh bone), a fracture of both bones of the right forearm just above the wrist, and a fracture of both bones of the right ankle.
Immediate attention was directed towards combating shock from loss of blood and fluid. She was given Demerol for pain.
The fracture of the femur was immobilized by traction to correct or prevent any overriding or angulation of that structure. This was accomplished by drilling a threaded stainless steel pin through the shin bone just below the knee and applying twenty-five pounds of weight in the long direction of the pull of the leg. She remained in traction until August 15, 1972 when surgery was performed. During this period of time she received constant dosages of Demerol. During the surgical procedure on August 15, 1972, an incision was made over the outer portion of the thigh, the fracture site was actually visualized and the fracture itself was "transfixed by an intramedullary rod," that is a stainless steel "nail" which is placed in the marrow of the bone, which extended from a point just below the fracture upwards through the head of the femur into the right buttock. It was ultimately removed under general anesthetic on January 31, 1974 (17 months from insertion) when a surgical incision was made in the right buttock and the tip of the rod was secured and pulled out.
The fractures to the arm and ankle were immobilized by casts.
Miss Moran was discharged from the hospital on August 23, 1972, at which time Demerol was discontinued and Tylenol # 4 was prescribed. Dr. Plauche could not recall specifically but acknowledged that he may have also prescribed Talwin, an analgesic, a synthetic pain killer. While Demerol is a narcotic and habit forming, Tylenol and Talwin are not.
Dr. Plauche testified that Miss Moran complained of pain throughout the period of treatment, namely, from the date of the accident, August 9, 1972, until March of 1974. He conceded that the presence of the rod in the femur could produce pain on walking. On his last examination and upon discharge he detected signs that Miss Moran had developed a drug dependency problem and recommended that she see Dr. F. A. Silva, a psychiatrist.
Dr. Plauche's prognosis of Miss Moran's orthopedic injuries was that all of the fractures had healed in good position. Very little, if any, future difficulty should be expected from the femur. It would not be unreasonable to anticipate difficulty with the right wrist, particularly in performing a task requiring a strong grip, heavy lifting or a lot of manual dexterity. When he saw her in March of 1974, he observed some *1145 residual stiffness of the wrist. He anticipated a minimum of difficulty from the right ankle injury. His opinion concerning the wrist injury was confirmed by Miss Joy W. Bonvillion, a licensed physical therapist, who assisted Miss Moran between July and December of 1974.
In April of 1973, Dr. Lewis Krust, a plastic surgeon, described the surgical scar on Miss Moran's right thigh as measuring approximately nine inches in length with a depression of one to one and one-half inches. Plastic surgery was performed on the 24th of that month by removing abdominal fat and placing it in the depressed thigh area. Photographs in evidence clearly depict the need for and success of this surgical endeavor. Still remaining is the surgical scar on the right buttock, occasioned by the removal of the rod from the femur, mentioned above.
As to the drug dependency problem experienced by Miss Moran, it suffices here to say that the medical testimony is to the effect that the Demerol prescribed by Dr. Plauche was not taken over such an extensive period of time so as to effect an addiction. The record further reflects that for a period of a year following her discharge from the hospital she obtained various prescriptions from other doctors in response to her complaints of pain and need for relief.
Dr. Silva agreed that the original prescription of a habit forming pain relieving drug would not have occasioned a drug dependency problem in the average person but that because of certain basic emotional traits Miss Moran was predisposed to drug dependency. He opined that absent any prior drug dependency problem of a similar nature, the accident and subsequent pain, disfiguration of the thigh, and general disabilities precipitated her compulsive desire for relief. On two occasions following her discharge from Dr. Plauche and while being treated by Dr. Silva she voluntarily submitted herself to treatment at a private institution. At the time of the trial her problem had abated and seemed to be under control. The medical testimony regarding the drug problem stands uncontradicted. It then remains a question of the degree of weight that is to be given the testimony adduced in support of drug dependency. We find a causal relation between the accident and Miss Moran's drug problem.
Considering all of the above, including the special damages (which we do not find necessary to particularize here), it cannot be said that the award of $90,000.00 is so excessively high as to constitute an abuse of the jury's discretion when it fixed the same.
Counsel for Mrs. Thornton argues that the judgment of the trial court limiting her recovery against GEIC is in error for the reason that the provisions of the policy are such that she is entitled to "stack" the limits of $5,000.00 for two vehicles and that her entire judgment should be against GEIC and Miss Moran, in solido. GEIC responds with the argument that this particular issue can not be raised for the first time on appeal. Supportive of this argument is the stipulation in the record which expressly states that the uninsured motorist coverage afforded the Thorntons by GEIC is in the amount of $5,000.00. Also filed in the record is the policy itself. The policy period therein shown is August 30, 1971 to August 30, 1972. Two vehicles are described in the policy, namely a 1969 Chevrolet pickup truck and a 1972 Chrysler. The limits of liability for each of these vehicles insofar as uninsured motorist protection is afforded is $5,000.00 for each person/$10,000.00 for each accident.
Notwithstanding the fact that the above stipulations were entered into and are a part of the record, we are of the opinion that Mrs. Thornton may now raise the issue of the stacking. We do not feel that the above stipulations should preclude Mrs. Thornton from endeavoring to claim additional coverage under the policy for the reason that the stipulation is an obvious oversight of the terms of the policy and the law as it then existed with respect to the stacking of uninsured motorist provisions. A resolution of this issue relates solely to a question of law based on facts contained in the record.
*1146 During the effective policy period, noted above, the authorities governing the stacking of uninsured motorist coverage were Elledge v. Warren, 263 So.2d 912 (3rd La. App., 1972), Graham v. American Casualty Company, 261 La. 85, 259 So.2d 22 (1972) and Deane v. McGee, 261 La. 686, 260 So.2d 669; Wilkinson v. Fireman's Fund Insurance Company, 298 So.2d 915 (3rd La.App., 1970); Brister v. American Indemnity Company, 313 So.2d 335 (1st La.App., 1975). These cases stand for the proposition that a plaintiff is entitled to stack uninsured motorist coverage where he pays premiums for two or more automobiles and sustains damages in excess of the mandatory minimum coverage. The accident giving rise to these cited authorities occurred prior to Act No. 137 of 1972.[3] Accordingly, Mrs. Thornton is entitled to have her judgment against GEIC increased to the sum of $7,500.00.
Mr. Thornton contends that the judgment in the Moran case is in error in that it assesses legal interest against GEIC on only the $50,000.00 from date of judicial demand and on the excess only from the date of judgment until paid, whereas GEIC should be liable for the interest on the entire amount from date of judicial demand: that is, that he should not be responsible for interest on the excess from date of judicial demand until date of judgment. We find no merit in this contention. See Doty v. Central Mutual Insurance Co., 186 So.2d 328 (3rd La.App., 1966), writs denied, 249 La. 486, 187 So.2d 451.
Relative to the issue of damages to the Chrysler, it was stipulated that they amounted to $1,591.14. The record reflects that this amount less the $100.00 deductible portion was paid to Thornton by GEIC. Included in the sum for special damages awarded to Mr. Thornton of $1,993.53 is the item of $1591.14. As shown above the trial judge rendered judgment against Mr. Thornton in the amount of $1,491.14 but limited it to the amount of Mr. Thornton's judgment against Miss Moran. Thornton contends that this was error because GEIC receipt and subrogation agreement pertaining to this particular loss. We note that the policy is in the record and it contains subrogation rights in favor of GEIC on its payment of any collision loss. GEIC, in its reconventional demand in the Thornton Suit, asserted its claim for this amount.
We do not feel that the absence of the subrogation agreement in the record under these circumstances should preclude GEIC's right to reimbursement. However, we fail to see any reason to interpose Mr. Thornton in this portion of the judgment. His award for special damages should be reduced by the amount he received from GEIC and the latter's judgment for the same should be only against Miss Moran.
Accordingly, the judgment in the Thornton suit (# 10,952) is amended to grant judgment in favor of Mrs. Myrtis Thornton in the amount of $7,500.00 against Sharon Moran and Government Employees Insurance Company, in solido, and to Mr. Frank L. Thornton by reducing the award of $1,993.50 against Miss Sharon Moran for special damages to the sum of $502.46; and in favor of GEIC against Sharon Moran by increasing the same from $5,750.00 to $8,250.00; and in favor of GEIC and against Sharon Moran in the amount of $1,491.14, deleting from this portion of the judgment Frank L. Thornton. Legal interest to run on each of the above judgments from date of judicial demand until paid. In all other respects the judgment is affirmed.
In the Moran Suit (# 10,953), the judgment is affirmed in all respects.
The costs in these suits are to be borne three-fourths by GEIC and Frank L. Thornton, in solido, and one-fourth by Sharon Moran.
JUDGMENT AMENDED IN PART AND AS AMENDED AFFIRMED.
NOTES
[1] Released on motion for summary judgment.
[2] In the Thornton suit, counsel for Miss Moran has stated in her appeal that the same was really perfected for the purpose of maintaining the status quo. Manifest error on the part of the district judge in the Thornton suit is not seriously urged.
[3] R.S. 22:11406 D.