# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## NO. 06-1624

**RANDY FONTENOT, ET AL.**

**VERSUS**

**PATTERSON INSURANCE, ET AL.**

### CONSOLIDATED WITH

### NO. 06-1625

**GERMAINE BROOKS, ET AL.**

**VERSUS**

**CITY OF LAFAYETTE, ET AL.**


************

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF LAFAYETTE, NOS. 2001-2002, 2001-2216
HONORABLE DURWOOD CONQUE, DISTRICT JUDGE

************

**JIMMIE C. PETERS**
**JUDGE**

************

Court composed of Chief Judge Ulysses Gene Thibodeaux, Sylvia R. Cooks, Jimmie C. Peters, Elizabeth A. Pickett, and J. David Painter, Judges.

**PICKETT, J., DISSENTS AND ASSIGNS WRITTEN REASONS.**


**AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.**

**Lawrence N. Curtis**
**Lawrence N. Curtis, LTD**
**Post Office Box 80247**
**Lafayette, LA 70598-0247**
**(337) 235-1825**
**COUNSEL FOR PLAINTIFFS/APPELLANTS/APPELLEES:**
**Randy Fontenot and Susanne Fontenot**

**Rickey W. Miniex**
**Clyde R. Simien**
**Todd M. Swartzendruber**
**Holli K. Yandle**
**Simien & Miniex**
**Post Office Box 81918**
**Lafayette, LA 70598-1918**
**(337) 269-0222**
**COUNSEL FOR DEFENDANT/APPELLEE/APPELLANT:**
**Lafayette City-Parish Consolidated Government**

**Colleen McDaniel**
**Assistant Attorney General**
**Louisiana Department of Justice**
**Division of Risk Litigation**
**556 Jefferson Street, 4th Floor**
**Lafayette, LA 70501**
**(337) 262-1700**
**COUNSEL FOR DEFENDANT/APPELLEE/APPELLANT:**
**The State of Louisiana Through The**
**Department of Transportation and Development**

PETERS, J.

These consolidated personal injury, wrongful death, and property damage actions arise from an automobile accident which occurred in Broussard, Louisiana, on March 23, 2001. The trial court judgments rendered therein have resulted in three appeals which are now before us. The first appeal is by the personal injury plaintiffs, Randy and Susanne Fontenot and their minor child. The merits issues in the Fontenot appeal are the respective fault and degrees of fault of the drivers of the two vehicles involved in the collision and the State of Louisiana, Department of Transportation and Development (DOTD). In the second appeal, DOTD appeals the issues of fault and degrees of fault, as well as the amount of the trial court's general damage award to Randy Fontenot rendered through a judgment notwithstanding the verdict (JNOV) of the jury. The third appeal arises from the efforts of the third-party plaintiff, Lafayette City-Parish Consolidated Government (City-Parish), to recover its claim for the property damage to the police car being driven by Mr. Fontenot at the time of the accident. In its appeal, the City-Parish also argues DOTD's degree of fault in causing the accident.

## DISCUSSION OF THE RECORD

The accident giving rise to this litigation occurred a few minutes after 11:00 p.m. on March 23, 2001, at the intersection of Morgan Street and Main Street in Broussard, Louisiana. At the time of the accident, Randy Fontenot was employed by the City-Parish as a policeman, had just responded to a domestic disturbance call, was driving a police vehicle owned by the City-Parish, and was attempting to locate the vehicle of an individual involved in the domestic disturbance. In searching for the vehicle, he proceeded east on Main Street in the direction of the Morgan Street intersection. At the same time, Germaine Brooks was driving his vehicle south on Morgan Street and

was also approaching the same intersection. Charlotte Phillips was a guest passenger in the Brooks vehicle. The collision between the two vehicles resulted in Ms. Phillips's death, in personal injuries to both Mr. Fontenot and Mr. Brooks, and in substantial damage to both vehicles.

Mr. and Mrs. Fontenot filed the first of the two consolidated suits involved in this appeal. During the course of the litigation, they named Mr. Brooks; his liability insurer, Patterson Insurance Company; and DOTD as defendants and sought recovery for the damages they sustained as a result of the accident. The City-Parish intervened against the same defendants seeking, among other relief, recovery of the property damages associated with loss of its patrol car.[1] After Patterson Insurance Company became insolvent, the Fontenots and the City-Parish added the Louisiana Insurance Guaranty Association (LIGA) as a defendant.[2]

Mr. Brooks and Leona Phillips, the mother of Charlotte Phillips, filed the second action, naming Mr. Fontenot and the City-Parish as defendants. In this action, Mr. Brooks sought to recover the damages he sustained, and Ms. Phillips pursued a wrongful death action for the loss of her daughter. The Fontenots reconvened against Mr. Brooks, and the City-Parish filed a third-party demand against DOTD. The two plaintiffs in this second suit settled the principal demands before trial. Thus, when the two consolidated suits came to trial, the only remaining party plaintiffs (both principal and third-party) were the Fontenots and the City-Parish. The remaining defendants

---

[1]The Fontenots and the City-Parish added other defendants during the course of the litigation, but they were all dismissed prior to trial.

[2]Under La.R.S. 22:1375-1394, the Louisiana Insurance Guaranty Association Law, a mechanism is provided "for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer . . ." La.R.S. 22:1376.

were Mr. Brooks, LIGA, and DOTD.[3]   At trial, the claims of the Fontenots were decided by a jury and the claims of the City-Parish were decided by the trial court.

After a four-day trial in which liability was the main factual dispute,[4] the jury answered the propounded interrogatories, assessing Mr. Brooks with ninety percent of the fault causing the accident and assessing Mr. Fontenot with the remaining ten percent.  The jury concluded that Mr. Fontenot sustained $255,000.00 in past medical expenses and $176,512.00 in loss of past wages, and would sustain $250,000.00 in lost future wages and earning capacity.  However, it awarded Mr. Fontenot no general damages.  The jury also concluded that Susanne Fontenot sustained $10,000.00 for loss of consortium and that their minor daughter sustained $5,000.00 in damages.  The trial court, on the other hand, concluded that the City-Parish was entitled to recover $19,994.87 for the property damage to its patrol car,[5] but apportioned fault for that damage equally between Mr. Brooks and DOTD.  Thus, the jury found no fault on the part of DOTD and the trial court found no fault on the part of Mr. Fontenot.

Mr. Fontenot responded to the jury verdict by filing a motion for a JNOV, or in the alternative a motion for a new trial.  In doing so, he challenged the jury's allocation

---

[3]We are rendering our decision and judgment in *Fontenot v. Patterson Insurance Company*, 06-1624 (La.App. 3 Cir. __/__/__), _____ So.2d_____, in which the jury verdict was rendered.  A separate judgment is being handed down today in the consolidated case of *Brooks v. City of Lafayette*, 06-1625 (La.App. 3 Cir.__/__/__),_____So.2d_____, wherein the judge decision was rendered.

[4]The extent of Randy Fontenot's personal injuries was not seriously disputed.  In reasons for judgment dated July 13, 2005 the trial judge described Mr. Fontenot's injuries as "multiple injuries, including a right ankle fracture with tendon avulsion, right heel fracture, right patella fracture, fractures of the right hand, compression fractures of the thoracic spinal vertebrae, right lower leg fracture, three fractured ribs, lung contusion, cardiac contusion, facial lacerations and laceration of the spleen."  The trial court further found that "Mr. Fontenot was in coma for several weeks.  He had a number of surgeries to repair his injuries and was treated for post traumatic stress disorder, anxiety, neurosis and depression."

[5]The City-Parish had sought recovery for medical expenses and workers' compensation weekly benefits paid to Mr. Fontenot.  However, that part of the judgment is not before us on appeal.

of fault and its failure to award him any general damages. The trial court granted the motion for a JNOV as to the general damages complaint, awarding Mr. Fontenot $500,000.00 in general damages. However, the trial court denied the motions in all other respects. Thereafter, the trial court executed three separate judgments—one with regard to its judgment on the City-Parish's claim, and two with regard to the jury verdict and its subsequent grant of the JNOV. The three appeals now before us were then timely filed.

## OPINION

### *Standard of Review*

Our initial inquiry on appeal is the appropriate standard of review for conflicting verdicts arising from a bifurcated trial. In addressing this inquiry, we must first acknowledge that the methodology for resolving such conflicts is disputed among the state's courts of appeal and indeed within this circuit.

The Louisiana Supreme Court, in several of its opinions, has indicated its awareness that the procedures for reconciling conflicting decisions by the jury and the judge in bifurcated trials vary in the courts of appeal. *See Powell v. Reg'l Transit Auth.,* 96-0715 (La. 6/18/97), 695 So.2d 1326; *Davis v. Witt*, 02-3102, 02-3110 (La. 7/2/03), 851 So.2d 1119; and *Hebert v. Rapides Parish Police Jury*, 06-2001, 06-2164 (La. 4/11/07), _____ So.2d. _____. However, it has chosen not to provide any instruction in this unsettled area save its original statements in *Thornton v. Moran*, 343 So.2d 1065 (La.1977).

Left to their own devices, the circuits have tried different approaches since the *Thornton* decision. In this circuit, our latest effort resulted in two panels rendering opinions on the same day in July of 2006, with each suggesting a different review

methodology.  These opinions were in *Hebert v. Rapides Parish Police Jury*, 05-471 (La.App. 3 Cir. 7/12/06), 934 So.2d 912, *rev'd on other grounds*, 06-2001, 06-2164 (La. 4/11/07), _____ So.2d. _____, and  *McDaniel v. Carencro Lions Club*, 05-1013 (La.App. 3 Cir. 7/12/06), 934 So.2d 945, *writ denied*, 06-1998 (La. 11/3/06), 940 So.2d 671.

In *Hebert*, the opinion's author suggested that a de novo review was the appropriate approach in part because the other procedures employed by the various circuits in the past were too cumbersome and unwieldy to survive objective application.[6]  A majority of the panel in *McDaniel* proposed a more complicated review process of fault findings which would: (1) ignore the jury's finding regarding the public defendant; (2) with regard to "the other defendants" choose the "more reasonable" finding of fact if neither of the conflicting findings was manifestly erroneous; (3) adopt the finding that was not manifestly erroneous if the other was; and (4) go to a de novo review if the judge and jury findings were both manifestly erroneous.[7]  *Id.*  The opinions in *Hebert* and *McDaniel* both began the standard of review analysis with reference to the supreme court decision in *Thornton*, 343 So.2d 1065, and documented their reasoning by review of the jurisprudence from this and other circuits which arose after that decision.

The decision in *Thornton* remains the supreme court's only direct instruction to the courts of appeal concerning the handling of conflicting judgments in bifurcated

_____

[6]The five-judge panel hearing *Hebert* was not unanimous.  The author was joined by one member of the panel while two others (one being the author of the opinion in *McDaniel*) concurred in the result but suggested the approach in *McDaniel* was the appropriate method of review.  The fifth judge disagreed with the decision's result.

[7]While the result was unanimous in *McDaniel*, the panel split two to one concerning the appropriate method of review.  The judge disagreeing with the method was the author of the opinion in *Hebert*.

trials. In *Thornton*, the jury and the trial court had reached contradictory results and rendered conflicting judgments. The first circuit reviewed the judgments separately, found no manifest error in either decision, and essentially affirmed each judgment. *Thornton v. Moran*, 341 So.2d 1136 (La.App. 1 Cir. 1976). The supreme court remanded the matter to the first circuit with instructions "to resolve the differences in the factual findings between the jury and the judge . . . and to render a single opinion based upon the record." *Thornton*, 343 So.2d at 1065. In so instructing the first circuit, the supreme court cited La. Const. Art. 5, § 10(B), which expressly extends the jurisdiction of appellate courts in civil cases to the review of facts as well as law.

Thus, while the supreme court has shown a present-day unwillingness to specifically instruct the courts of appeal with regard to the appropriate standard of review, it has not been entirely silent on the subject. Because *Thornton* remains the only direct instruction by the supreme court on this issue, we must look to it for guidance. In doing so, we choose not to read an ambiguity into the two infinitive phrases, "to resolve the difference in the factual findings between the jury and the judge . . . and to render a single opinion based upon the record." Instead, we find it reasonable to conclude that the supreme court gave its blessing to an independent de novo review by the use of this language.

We reach this conclusion in part because, two years before its decision in *Thornton*, the supreme court had used the same constitutional extension of appellate jurisdiction to law and facts, La. Const. Art. 5, § 10(B), to hold that where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the reviewing court should make its own independent de novo review and assessment of the record.

*Gonzales v. Xerox Corp.*, 320 So.2d 163 (La.1975). *See also Campo v. Correa*, 01-2707 (La. 6/21/02), 828 So.2d 502. We believe that a fair reading of *Thornton* supports a de novo methodology at least as logically as it supports any other standard of review heretofore advanced by any of the courts of appeal.[8]

Our interpretation of the remand instructions found in *Thornton* is also supported by the supreme court's approach to its review of this circuit's decision in *Hebert*, 934 So.2d 912. While declining to comment on the approach of this court in harmonizing the conflicting verdicts, and without stating its own approach, the supreme court addressed the liability issue by performing what amounted to a de novo review of the record before it. *Hebert*, _____ So.2d _____.

Based on the above rationale, we adopt, and will utilize in our review of this matter, the de novo procedure used by this court in *Hebert*, 934 So.2d 912. We find it to be the most practical and legally sound procedure susceptible of uniform application, and conclude that it complies with the supreme court instruction in *Thornton*, 343 So.2d 1065.

### *Liability Issues*

It is undisputed that Main Street is the favored street at the intersection where the accident occurred, and that both Main and Morgan Streets are part of the Louisiana State Highway System. The intersecting streets are controlled by a sequencing traffic light designed, constructed, and maintained by DOTD. The standard red-yellow-green sequenced traffic signals control the flow of traffic through the intersection from 5:00 a.m. until 11:00 p.m. each day. However, at eleven o'clock each night the light

---

[8]In the present case DOTD urges us to fully implement both judgments even though they are based on conflicting findings of fact by reviewing each under the manifest error standard. We reject this approach. DOTD's solution is precisely what the court of appeal did in *Thornton*, a procedure which the supreme court rejected.

automatically switches to a flashing mode, with the yellow flashing for the favored traffic on Main Street and the red flashing for Morgan Street. At the time of the accident, the traffic light had just switched to flashing mode.

Approximately one year before the accident, DOTD had widened and overlaid the intersection. In doing so, DOTD had added a third lane for left-turning vehicles in all four approaches. Additionally, DOTD had added a stop bar in the turning lanes, but not in the through lanes. Vision to the west for traffic traveling south on Morgan Street and to the north for traffic traveling east on Main Street is impaired by a four-story brick building situated on the northwest corner of the intersection. This building had been constructed on that location in 1917, and served as a library.

While the physical surroundings at the intersection are not in dispute, the determination of liability for the accident suffers from the paucity of eyewitness testimony. Of the three persons involved in the accident, Ms. Phillips died of her injuries at the scene, Mr. Brooks did not testify, and Mr. Fontenot could not recall the accident because of an amnesic disorder arising from the injuries he sustained in the accident. The only information provided the triers of fact by those involved in the accident was presented second-hand, through the testimony of the officer who questioned Mr. Brooks at the scene on the night of the accident. Mr. Brooks told the officer that he stopped at the red flashing light on Morgan Street, saw no vehicles approaching on Main Street, and was driving across the intersection when Mr. Fontenot's patrol car struck his vehicle.

"In evaluating the evidence, the trier of fact should accept as true the uncontradicted testimony of a witness, even though the witness is a party, where the record indicates no sound reason for its rejection." *Robertson v. Scanio Produce &*

8

*Institutional Foods, Inc.*, 449 So.2d 459, 462 (La.1984). There are no circumstances in this record casting suspicion on the reliability of Mr. Brooks's statement, and no reason for us not to accept the explanation of his actions as true.[9] Thus, we accept his statement as true.

In performing a de novo examination of the evidence pertaining to the fault of Mr. Fontenot, Mr. Brooks, and DOTD, we must perform a duty-risk analysis. This is a five-step process which requires that a party asserting fault on another establish (1) that the party whose fault is at issue had a duty to conform his conduct to a specific standard, 2) that the party's conduct failed to conform to the appropriate standard, (3) that the party's conduct was a cause-in-fact of the injuries at issue, (4) that the party's substandard conduct was a legal cause of the injuries at issue, and (5) that there were actual damages. *Toston v. Pardon*, 03-1747 (La. 4/23/04), 874 So.2d 791. A party asserting comparative fault bears the burden of proof by a preponderance of the evidence that the other party's fault was a cause-in-fact of the damage complained of. *Watson v. Brazeel*, 36,499 (La.App. 2 Cir. 12/18/02), 833 So.2d 1276, *writ denied*,

---

[9]According to the record, DOTD subpoenaed Mr. Brooks to testify. He was served but did not appear. His deposition was taken but not introduced. Instead, DOTD proffered a time-lapse video showing the accident, and a CD made from it, that had supposedly been recorded on surveillance tapes from a nearby gas station. By a motion in limine filed before trial the plaintiffs, citing La.Code Evid. arts. 402 and 403, sought a ruling that the time lapse video was unreliable and inadmissible, arguing that even if it were relevant and admissible it should be excluded because its probative value was substantially outweighed by the danger of unfair prejudice and confusion of the issues, and because it would mislead the jury. The trail court, after viewing the video, agreed and excluded the offering, noting in oral reasons that it was time lapse photography and showed the Brooks car "stopped a couple of times." The court thought this would be very confusing to the jury and too misleading to overcome its highly questionable probative value. Also, the trial court noted that the video, having little or no probative value in and of itself, would have to be explained to the trier of fact, which could result in the trial taking a disproportionate time over the issues of when, if, and how many times Mr. Brooks's car stopped before entering the intersection.

Although DOTD did not assign error to the exclusion of these offerings, it argues in its appellate brief that the trial court erred in excluding them. We have viewed the video and the CD and are totally in accord with the trial court's assessment of their lack of evidentiary significance and the likelihood they would have caused confusion and resulted in an inordinate waste of time.

03-217 (La. 04/04/03), 840 So.2d 1215. The cause-in-fact element generally involves a "but for" inquiry which questions whether or not the injury would have occurred "but for" the defendant's substandard conduct. *Petre v. State ex rel. Dept. of Transp. & Dev.*, 00-545 (La.App. 3 Cir. 12/29/00), 775 So.2d 1252, *aff'd* 01-876 (La. 4/3/02), 817 So.2d 1107. Additionally, fault in a vehicular collision case is determined by judging the conduct of each motorist under the facts and circumstances of each particular case. *Matthews v. Arkla Lubricants Inc.,* 32,121 (La.App. 2 Cir. 8/18/99), 740 So.2d 787.

### *Mr. Fontenot's Fault*

Because Mr. Fontenot was facing the flashing yellow light, he was authorized to proceed through the intersection, but he had a duty to do so "with caution." La.R.S. 32:234(A)(2). DOTD and Mr. Brooks assert that Mr. Fontenot violated this duty in that he proceeded through the intersection at a speed in excess of the posted speed limit,[10] and that this excessive speed constituted fault which was a cause-in-fact of the accident. But the fact that a motorist involved in an accident was speeding does not in and of itself require a finding of liability. *Loveday v. Travelers Ins. Co.*, 585 So.2d 597 (La.App. 3 Cir.), *writ denied* 590 So.2d 65 (La.1991).

In support of their position on this issue, they rely solely on the testimony of Dr. Andrew McPhate, a former professor of mechanical engineering who was recognized by the trial court as an expert in mechanical engineering and vehicle dynamics. Dr. McPhate investigated the accident on behalf of DOTD but did not attempt to fully reconstruct the accident. Instead, with the information he gathered in his investigation, he concluded that Mr. Fontenot applied his brakes before impact, and was traveling

---

[10]Louisiana Revised Statutes 32:42 does allow a police officer to violate the speed limit under certain limited circumstances. However, the facts before us does not grant that privilege to Mr. Fontenot in this case.

fifty-six miles per hour at the time of impact. The speed limit for traffic on both streets at the intersection was thirty-five miles per hour.

While Dr. McPhate testified to speed at impact, he offered no opinion that would connect the vehicle's speed to the cause of the accident. Thus, DOTD failed to establish the "but for" portion of the cause-in-fact test. That is to say, DOTD offered no evidence to establish that, but for the Mr. Fontenot's excess speed the accident would not have happened. While such a scenario is possible, there was no evidence presented to establish that possibility as a fact, or even a probability. To reach that conclusion based solely on the speed of the vehicles would be mere speculation on our part. Thus, we find that DOTD failed to meet its initial burden of proof to show that Mr. Fontenot's actions contributed to the collision. Accordingly, we find Mr. Fontenot free from fault.

### Mr. Brooks's Fault

Faced with a flashing red light, Mr. Brooks' had a duty to stop before entering the intersection and yield the right of way to traffic on Main Street. La.R.S. 32:234(A)(1). Because the intersection did not contain a cross-walk or a stop bar,[11] Mr. Brooks had a duty to stop at a point where he had a view of approaching traffic on Main Street, and to not proceed if he observed any traffic approaching on Main Street that would constitute an immediate hazard if he attempted to enter the intersection. *Id.*; La.R.S. 32:123(B). As stated in *Toston v. Pardon*, 874 So.2d 791, 802,

> [S]topping is only half the duty, the other half is not to proceed until the determining that the way is clear. *Guillot v. Valley Forge Ins. Co.*, 99-1044, p. 4 (La.App. 3 Cir. 12/8/99), 753 So.2d 891, 894. The second duty is heavier and requires an even greater degree of care when the intersection is blind, or partially obstructed. *Continental Ins. Co. v. Duthu*, 235 So.2d 182, 186 (La.App. 4 Cir.1970). A driver entering a

---

[11]The stop bar is referred to as a "limit line" in La.R.S. 32:234(A)(1).

superior highway where his view is obstructed is under a duty to proceed with extraordinary caution. *Taylor v. State*, 432 So. 2d (La.App. 2 Cir.1983).

As this court recognized in *McCauley v. LaFleur,* 213 So.2d 176, 179 (La.App. 3 Cir. 1968), "[t]o stop and then proceed in the immediate path of oncoming vehicles constitutes negligence."

Dr. McPhate described the library's location as creating a "blind intersection," and Archie Burnham, an expert in traffic design and traffic safety, was of the opinion that Mr. Brooks stopped at a point where the intersection view was obstructed by the library building. Accepting his statement to the investigating officer as true, it is obvious that Mr. Brooks stopped at a point where the library building prevented him from observing the oncoming traffic because, had he stopped at a point where he could have seen down Main Street, nothing prevented him from observing the approaching police car. In fact, had Mr. Brooks looked continuously to make sure he could proceed across the intersection with safety, the accident would not have occurred. We find that his negligence was a cause-in-fact of the collision.

### *DOTD's Fault*

Two DOTD employees working in the district where the intersection is located, Michael Moss, the district maintenance engineer, and Charles Moran, the district maintenance superintendent, testified concerning the intersection inspection procedure. Their testimony established that DOTD inspected the intersection once every two weeks. But for the limited purpose of determining what, if anything, needed to be repaired. Mr. Moran, as maintenance superintendent, was responsible for having the inspection performed.

12

Richard Savoie, a project development engineer in DOTD's road design section, testified that when the widening and overlay project was completed in 2000, stop bars were placed only in the turning lanes of the four approaches, and at a distance away from the intersection itself. He explained that the purpose of a stop bar in the turning lane is to establish the point at which a vehicle should stop in order to avoid being "clipped" by a vehicle coming from another direction and turning left onto the street. It is not to be used as a stopping guide for through traffic.

The record reflects that with regard to the design and construction of intersections, DOTD maintains a set of standard plans referred to as the PM-01 plan. This standard plan is used by the contractor and project engineer during the construction of a given project and calls for a stop bar in the through lanes as well as the turning lanes. However, the design engineer for a particular intersection can choose to deviate from this standard plan, and his or her decision is controlling. In the case of the Main Street/Morgan Street intersection, the design engineer chose not to require stop bars in the through lanes. The record is silent concerning the reason for this decision.

Mr. Burnham evaluated the intersection on behalf of the plaintiffs, and it is his professional opinion that, while Mr. Brooks's fault was a cause-in-fact of the accident, the design of the intersection contributed as well. In expressing this opinion, Mr. Burnham pointed to at least four deficiencies in the highway environment which contributed to the accident:

1. An appropriate design of the intersection would require a 250 foot sight distance and, because there was no guide or stop line in the through traffic lane, Mr. Brooks was left to his own judgment in where stop. Mr. Burnham pointed out that, if Mr. Brooks picked the wrong stopping point (which he apparently did in this case), he would be left with less than one

13

hundred feet of sight distance in which to make an adequate decision on how to proceed.

2.  Mr. Burnham considered the absence of the stop bar, particularly at night, to be a defect. According to Mr. Burnham, not only is the stop bar generally required by DOTD's own PM-01 standard plan, but it is also called for in the Manual on Uniform Traffic Control Devices (MUTCD) promulgated by the National Committee for Uniform Traffic Control Devices (NCUTCD).[12] The stop bar's purpose is to give the approaching motorist assistance in locating the optimum point for making the decision to safely traverse the favored roadway. Although variances are permitted, Mr. Burnham could find no justification for not providing the stop bars in the approaching lanes of this intersection. In his opinion, the failure to follow the requirements of the PM-01 standard created a hazardous condition at this intersection.

3.  Mr. Burnham found no record of a traffic engineering update by DOTD since the traffic signal had been installed over twenty years before the accident. According to Mr. Burnham, such a study would have included a review of the accident patterns, the type of traffic at the intersection, and the nature of the traffic both day and night. Had such a study been conducted, he opined, it would have disclosed the deficiencies present, including particularly the absence of stop bars in the through lanes. The study would have also revealed the eighteen collision-type accidents that had occurred at the intersection prior to the accident at issue, as well as the fact that eleven of those accidents involved traffic approaching from the eastbound lane.

4.  According to Mr. Burnham, his experience and review of the literature on the subject caused him to be of the opinion that the intersection would have been made safer if DOTD had not programed the traffic signal to switch to flashing signals at 11:00 p.m. each night. He testified that a safer method is to have the light remain on a red-yellow-red sequence twenty-four hours per day, but on an actuated basis. By an actuated basis, he meant that the light would remain green for Main Street, the favored street, unless and until a vehicle approached from either direction on Morgan Street. At that point, the signal would cycle to green on Morgan Street to allow the traffic to safely pass. As an alternative, he suggested that had the traffic signal cycled to a red/red flashing condition, both drivers would have to stop, thereby decreasing the likelihood of an accident. Such an adjustment, according to Mr. Burnham would require a minimum of expense and trouble in re-programing the circuitry.

---

[12]Burnham served on the NCUTCD and was one of the contributors to the development of the MUTCD. He also served on committees of the American Association of State Highway and Transportation Officials (AASHTO) which addressed traffic control and safety standards.

14

Mr. Burnham concluded, based on the combination of deficiencies he discovered in his investigation, that this was a dangerous intersection. The import of his testimony was that its deficiencies, in combination with the negligence of Mr. Brooks, caused the accident.

Dr. Jack Humphries, an expert in traffic engineering and highway design, testified as an expert for DOTD. He disagreed with Mr. Burnham's opinion concerning the importance of the stop bar on the through street although he admitted that if Mr. Brooks had stopped at a point even with the stop bar in the turning lane, he would not have been able to see eastbound approaching traffic on Main Street. Dr. Humphries's solution was for the driver to pull up farther and stop at a point which did not encroach on Main Street and which would allow him unrestricted vision. Concerning the effect of the flashing light, he testified that his research revealed that problems as described by Mr. Burnham have not been prevalent at intersections involving streets of lesser classifications than arterial, and in this case only one, Main Street, was an arterial. Also, he observed that the MUTCD does not prohibit flashing lights, especially for late-night, low-volume traffic, and that the use of such signals is a matter of engineering judgment. However, he acknowledged that his one visit to the intersection occurred in the daylight hours, that the pictures he relied upon in his study were also taken in the daytime, and that they were taken on the opposite side of the intersection from the direction of travel of the Brooks car. His ultimate opinion was that Mr. Brooks's failure to comply with his duty to stop at a point where he could see approaching traffic was the sole cause of the accident.

In a tort action against DOTD, whether based on strict liability or negligence, the plaintiff must show: (1) the property which caused the damage was in the custody of

15

the DOTD, (2) the property was defective because it had a condition that created an unreasonable risk of harm, (3) DOTD had actual or constructive notice of the risk, and (4) the defect in the property was a cause-in-fact of the plaintiff's injuries. *Toston*, 874 So.2d 791. The analysis under either theory, strict liability or negligence, is the same. *Id.* DOTD's duty is to "maintain the public highways in a condition that is reasonably safe for persons exercising ordinary care and reasonable prudence." *Id.* at 799. To that end, the design of a controlled intersection must "not present an unreasonable risk of harm to motorists." *Id.*

Based on the facts regarding this intersection and Mr. Burnham's reasoning, which we accept in preference to that of any other expert testifying, we find that the defective condition of the intersection and its signing created an unreasonably dangerous condition and was a cause-in-fact of the accident. Dr. McPhate and Mr. Burnham both testified that at night the library building in the northwest corner of the intersection presented an obstruction to view to traffic entering the intersection on Morgan Street; Mr. Burnham opined that the sight obstruction of the library building at night, together with the absence of a stop bar on the Morgan Street through lane, presented a motorist proceeding south on Morgan street with no guidance on the optimal stopping location. Furthermore, the presence of the stop bar in the turning lane was deceptive because it could mislead a driver into thinking that was a safe stopping location, whereas it was not. Mr. Burnham made a connection between the number of accidents at the intersection and the unexplained disregard of DOTD's own standard requiring stop bars in all approaches. Dr. Humphries's testimony did not detract from Mr. Burnman's well reasoned opinion, as Dr. Humphries's opinion was conclusory and without reasoned foundation.

We also find more convincing Mr. Burnham's testimony regarding the deficiency in the traffic signal. His documented explanation of the risk in converting to a flashing mode at 11:00 p.m. is reasonable, as were his alternatives to this action. On the other hand, DOTD's evidence focused primarily on its attention to proper maintenance of the signals—a nonissue in this litigation. At best, Dr. Humphries established that the installation of a flashing light was not itself a violation of AASHTO or MUTCD minimum standards. He did not address the effect of the flashing system at this particular intersection.

DOTD also argues that it proved it had discharged its duty of care to the motoring public because the evidence at trial established that the intersection at issue met the AASHTO and MUTCD standards or requirements. DOTD argues that because the intersection met these standards or requirements, it is entitled to the presumption of La.R.S. 32:235(E) that it is without fault in causing the accident. We disagree that DOTD is entitled to the presumption provided in that statute. Louisiana Revised Statutes 32:235(E) provides that if there exists proof that, at the time of the accident, DOTD was "in compliance with the provisions of the department's traffic control devices manual shall be prima facie evidence of discharge by [DOTD] of its obligations to the motoring public." Simply stated, the evidence establishes that DOTD was not in compliance with its own traffic control devices manual in that it failed to install stop bars for the through lands.

We also find that DOTD had knowledge of the possible defects in the intersection. In *Hammons v. City of Tallulah*, 30,091 (La.App. 2 Cir. 12/10/97), 705 So.2d 276, *writ denied*, 98-407 (La. 3/27/98), 716 So.2d 892 and 98-440 (La. 3/27/98), 716 So.2d 894, constructive knowledge of a hazardous condition sufficient to allow

17

recovery against a public body was based on facts demonstrating that the defective condition had existed for such a period of time that it should have been discovered and repaired if the public body had exercised reasonable care. In the present case the blind intersection was as old as the library building and the traffic light had been present for more than twenty years. Additionally, the accident records of the Town of Broussard demonstrated that of the eighteen accidents occurring at that intersection, more than half involved traffic traveling east on Main. The long-term existence of the hazardous conditions and the accident history at this intersection was sufficient to establish that the DOTD had actual or constructive notice that it was not in compliance with its own standards. *See Cole v. State ex rel. Dept. of Transp. & Dev.*, 99-912 (La.App. 3 Cir. 12/22/99), 755 So.2d 315, *writ denied*, 00-199 (La. 4/7/00) 759 So.2d 766. We have no hesitancy finding that DOTD knew or should have known that the intersection posed an unreasonable risk.

### *Apportionment of Fault*

The ruling case law on the apportionment of fault between parties is *Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So.2d 967 (La.1985). In *Watson*, the supreme court identified various factors that may influence the degree of fault assigned, including:

> (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actors, whether superior or inferior; and (5) any extenuating circumstances that might require the actor to proceed in haste, without proper thought.

*Watson*, 469 So.2d at 974.

In the present case, we have already concluded that the parties at fault in causing the accident were Germaine Brooks and DOTD. In evaluating their conduct pursuant

18

to the *Watson* factors, and without restating the factual and legal conclusions reached in this de novo review, we find that their fault was in equal proportions.

### *Damages*

On appeal DOTD questions only the amount of general damages awarded to Mr. Fontenot. Specifically, DOTD asserts that the trial court "committed manifest error by amending the jury verdict by JNOV to add $500,000 in general damages." This assertion is premised on the argument that the trial court award was an additur and not a JNOV.

An additur may be entered "only if the issue of quantum is clearly and fairly separable from other issues in the case." La.Code. Civ.P. art 1814. In its brief, DOTD declares that "the parties agreed for the judge to grant an *additur* in lieu of a new trial and to reform the jury verdict accordingly, since the damage issue was separable from liability issues." Then, observing that "*additur* only allows reformation of the award to the lowest reasonable amount," DOTD sums up its briefed argument in support of this assignment with the contention that the $500,000.00 JNOV was excessive.

We have carefully examined the proceedings in relation to the motion for a JNOV, or in the alternative a motion for a new trial, and we find nothing in the record to suggest either an agreement between the parties or DOTD's consent to convert the motions to an additur. Mr. Fontenot's motion was for a JNOV, and the judgment rendered by the court was plainly and simply a JNOV. Inasmuch as DOTD has made no factual argument and no valid legal argument that the JNOV was improperly granted or that it was excessive, there is nothing further for us to review concerning this assignment of error. The assignment has no merit.

19

## DISPOSITION

For the foregoing reasons, we affirm the judgment on the verdict of the jury as amended by the trial court's judgment notwithstanding the verdict and affirm the remaining awards of damages in the judgment on the jury verdict. We reverse the jury's failure to assign fault to the State of Louisiana, Department of Transportation and Development, and reverse its assignment of fault to Randy Fontenot. We reallocate fault, finding that the State of Louisiana, Department of Transportation and Development, and Germaine Brooks were equally at fault in causing the accident at issue in this litigation, and assess each with fifty percent of the fault. Accordingly, we render judgment in favor of Randy and Susanne Fontenot, individually and on behalf of their minor daughter, against the State of Louisiana, Department of Transportation and Development, for fifty percent of all damages awarded, and in favor of Randy and Susanne Fontenot, individually and on behalf of their minor daughter, against Germaine Brooks and Louisiana Insurance Guaranty Association for fifty percent of all damages awarded. We affirm the judgment awarding legal interest according to law but providing that Louisiana Insurance Guaranty Association is responsible for legal interest on its obligation only from March 17, 2003. We recast the judgment for costs, ordering that the State of Louisiana, Department of Transportation; Germaine Brooks; and Louisiana Insurance Guaranty Association shall be responsible for court costs, including cost of this appeal, in proportion to their fault. Pursuant to the requirement of La.R.S. 13:5112(A), we set the fifty percent share of costs assessed to the State of Louisiana, Department of Transportation and Development in a monetary amount, $21,882.31 in lower court costs and $4,193.34 in appellate costs.

**AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.**

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

06-1624

RANDY FONTENOT AND SUSANNE FONTENOT

VERSUS

PATTERSON INSURANCE AND CHRISTOPHER BROOKS

consolidated with

06-1625

GERMAINE AND LEONA PHILLIPS

VERSUS

CITY OF LAFAYETTE

**PICKETT, J., dissenting.**

I maintain that the appropriate method of review in a case involving conflicting verdicts is the process set out in *McDaniel v. Carencro Lions Club*, 05-1013 (La.App. 3 Cir. 7/12/06), 934 So.2d 945, *writ denied*, 06-1998 (La. 11/3/06), 940 So.2d 671. Thus, I dissent from the *de novo* review employed by the majority.

Further, I disagree with the majority's finding of no liability on the part of the plaintiff, Randy Fontenot. I agree with the jury's assessment of 10% fault to Mr. Fontenot. Although I agree with Judge Peters' statement of the standard of care and the duty imposed in a motorist approaching a flashing yellow light, I believe that the plaintiff violated that duty by traveling 21 miles per hour over the posted speed limit, thereby contributing to the cause of the accident.

For these reasons, I respectfully dissent.